### BRIDGES et al. v. UNITED STATES.

#### No. 12597.

United States Court of Appeals
Ninth Circuit.

Aug. 24, 1950.

Dissenting Opinion As Amended
Sept. 6 and 21, 1950.

Mathews, Circuit Judge, dissented.

See, also, 90 F.Supp. 973.

Gladstein, Andersen, Resner & Leonard, Norman Leonard, Vincent Hallinan, James Martin MacInnis, William F. Cleary, all of San Francisco, Cal., for appellant.

Frank J. Hennessy, U.S. Atty., San Francisco, Cal., F. Joseph Donohue, Sp. Asst. Atty. Gen., R. B. McMillan, Asst. U.S. Atty., San Francisco, Cal., for appellee.

Wayne M. Collins, San Francisco, Cal., for American Civil Liberties Union, amicus curiæ.

Before MATHEWS, HEALY, and ORR, Circuit Judges.

HEALY, Circuit Judge.

The matter before us is a motion under Rule 39(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., to vacate an order of the district court revoking the bail of appellant, Harry Bridges. The Rule in part provides: "The supervision and control of the proceedings on appeal shall be in the appellate court from the time the notice of appeal is filed with its clerk, except as otherwise provided in these rules. The appellate court may at any time entertain a motion * * * to modify or vacate any order made by the district court * * * in relation to the prosecution of the appeal, including any order fixing or denying bail."

Bridges and two others were indicted May 25, 1949 on a charge of conspiracy to defraud the United States by impairing and defeating the proper administration of its naturalization laws by falsely swearing in Bridges' naturalization proceeding that he, Bridges, had never belonged to the Communist Party. A second count against Bridges alone charged in similar terms the commission of the substantive offense of false swearing in his naturalization hearing before the district court. After a lengthy trial terminating in April, 1950, Bridges was adjudged guilty on both counts. At the time of his appeal to this court, taken immediately after conviction, his existing bail was increased by order of the district judge from $5,000 to $25,000 and he was enlarged thereunder, pending appeal, on the statement of the United States district attorney—apparently acquiesced in by the judge—that his case involves a substantial question which should be determined by the appellate court. His appeal has been diligently prosecuted and a transcript of the extensive record lodged with our clerk.

On July 31, 1950, the United States gave notice of a motion for revocation by the district court of its bail order. The moving ground was that since appellant was enlarged on bail "he has pursued, and will continue to pursue, unless said motion is granted and said defendant remanded to the custody of the Marshal, a course of conduct and activities dangerous and detrimental to the public welfare and inimical to the safety and national security of the United States." Accompanying the motion was an affidavit of an official of the immigration service, hereafter to be noticed. Following a hearing on the motion, in the course of which Bridges testified, the court revoked its order granting bail and remanded appellant to custody; and we

understand that he has since been confined in jail. As already said, he has here moved to vacate the order of revocation.

In the course of the hearing before us a suggestion was made from the bench that possibly, in view of the perfection of the appeal, the district court had lost jurisdiction to act. However, we have concluded that the jurisdictional point is not well taken. Rule 46(a) (2) provides that "the court or the judge or justice allowing bail may at any time revoke the order admitting the defendant to bail." This provision seems to permit of action below notwithstanding the appeal.

The trial judge did not intimate, nor did counsel, that the substantiality of the question on appeal had been reexamined and a different conclusion reached. On the contrary counsel for the government reiterated the position he originally took, namely, that a substantial question for review exists. Also disclaimed by the government was any contention that Bridges may contemplate flight from the jurisdiction pending the final determination of his case. Nor was it suggested that his appeal has not been diligently prosecuted.

We are obliged now, notwithstanding the concession of counsel and of the trial court, to inquire for ourselves whether the appeal presents any meritorious question. Our obligation in that respect is virtually the same as if application had been made to us in the first instance. A number of grounds for reversal are asserted in the statement of points filed by appellant simultaneously with his appeal. We consider but one of them. On the trial motions were made by the defendants to dismiss the indictment on the ground, among others, that the prosecution was barred by the statute of limitations. Section 3282 of Title 18 U.S.C.A., effective September 1, 1948, provides that: "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within three years next after such offense shall have been committed." Unless some other provision of law provides the contrary the indictment here is barred by this limitation, it having been found and returned some three years and seven months after the commission of the most recent of the alleged offenses.

In Marzani v. United States, 1948, 83 U.S.App.D.C. 78, 168 F.2d 133, the Court of Appeals of the District of Columbia considered the statutory provisions which the government claims suspended the running of the three-year limitation as against the offenses for which Bridges was indicted. The case before that court involved a charge that the government had been defrauded by false swearing by Marzani, a civil service employee, that he had never been a member of the Communist Party. The charge appears closely analogous to those found in the present indictment. The court held the suspension provision inapplicable and reversed the conviction on nine counts on the ground that the prosecution was barred by the ordinary three-year limitation. Certiorari was granted by the Supreme Court and the judgment affirmed by an equally divided court. 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431. In United States v. Gottfried, 1948, 165 F.2d 360, the Second Circuit reached what appears to be a contrary conclusion in considering an indictment charging Gottfried with making a false and fraudulent statement in writing in a matter affecting the administration of the Office of Price Administration. The indictment had been found more than three years after the commission of the crime, but the court thought that the running of the statute was suspended by the act extending the limitation until three years after hostilities had ended in cases involving defrauding or attempts to defraud the United States or any agency thereof. The Supreme Court denied certiorari, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139.

The effect of the suspension acts or the force of earlier decisions relied on or distinguished in the Marzani and Gottfried cases need not here be considered, nor do we now express, or even entertain, any opinion as to which court was right. Enough to say that in the condition of the decisions a seriously debatable question is

presented for determination by this court and probably by the Supreme Court.

■ .It has frequently been remarked in the federal decisions, and is clearly the correct principle, that bail after conviction should not be allowed if it appears that the appeal is frivolous and has been taken purely for delay. Rule 46(a) (2) emphasizes this aspect of the law by providing that "bail may be allowed pending appeal or certiorari only if it appears that the case involves a substantial question which should be determined by the appellate court." However, the inclination of the judges, more especially those of the appellate courts, has been in the direction of liberality in granting bail even where merit is rather obviously absent. But where a meritorious question exists bail becomes a matter of right, not of grace. As said in the leading case of Hudson v. Parker, 1895, 156 U.S. 277, 285, 15 S.Ct. 450, 453, 39 L.Ed. 424, "The statutes of the United States have been framed upon the theory that a person accused of crime shall not, until he has been finally adjudged guilty in the court of last resort, be absolutely compelled to undergo imprisonment or punishment, but may be admitted to bail, not only after arrest and before trial but after conviction, and pending a writ of error."

An attempt to review all the holdings bearing on the subject would extend this opinion to unreasonable lengths. A few, only, of the more carefully considered decisions will be noticed. In McKnight v. United States, 113 Fed. 451, 453, Judges Lurton and Day, then on the Sixth Circuit and later on the Supreme bench, granted bail after it had been refused by the trial judge. Judge Lurton said for the court that "Detention pending the writ is only for the purpose of securing the attendance of the convicted person after the determination of his proceedings in error. If this can or will be done by requiring bail, there is no excuse for refusing or denying such relief." He then quoted the passage from the opinion in Hudson v. Parker, supra, just quoted by ourselves.

In United States v. Motlow, 7 Cir., 10 F.2d 657, Mr. Justice Butler of the Supreme Court, in granting bail pending appeal after its denial by the district judge and by the circuit court, remarked on the purpose of the federal statute and rules that no one shall be required to suffer imprisonment for crime before the determination of his case in the court of last resort. He said, 10 F.2d page 662, that "abhorrence, however great, of persistent and menacing crime will not excuse transgression in the courts of the legal rights of the worst offenders. The granting or withholding of bail is not a matter of mere grace or favor. If these writs of error were taken merely for delay, bail should be refused; but, if taken in good faith, on grounds not frivolous but fairly debatable, in view of the decisions of the Supreme Court, then petitioners should be admitted to bail." He found nothing to indicate that the attendance of the convicted persons could not be secured by reasonable bail. "No danger of flight," he said, "is suggested. The applicants have caused no delay, and nothing appears to indicate any purpose not to proceed with diligence." Similarly in the treason case of D'Aquino v. United States, 9 Cir., 180 F.2d 271, where both the trial judge and this court had denied bail, Mr. Justice Douglas allowed it on the view that the appeal was not frivolous, quoting with approval the above expressions of Mr. Justice Butler. He observed that the test of the right to bail is as set out in Rule 46(a) (2) of the Criminal Procedure Rules, namely, whether the case involves a substantial question which should be determined by the appellate court.

In Rossi v. United States, 8 Cir., 11 F.2d 264, 265, Judge Walter H. Sanborn, writing the opinion for the court, said that the purpose of taking bail on writ of error "is to secure the presence of the accused or convicted person and his service of his sentence after that sentence has been finally affirmed by the appellate court." He observed that one who suffers imprisonment after conviction and during the pendency of his appeal suffers the same injustice as is endured by one who is denied bail before his trial and is subsequently acquitted; and he added that "it was to

prevent just such imprisonment that the acts of Congress and the rules of court allowing bail were adopted. * * *" The judge then declared that "the basic principle which underlies and ought to govern the allowance of bail both before and after trial is the same." Discussing the discretion of the judge to grant or refuse bail, the opinion states that it is not to rest in the personal preference or desire of the judge but is a discretion to be soundly and fairly exercised "in accordance with the established rules of law and the controlling decisions and practice of the federal courts upon this subject." An examination of the record on appeal in that case failed to satisfy the court "beyond a reasonable doubt that the questions of law [presented] are frivolous or that their writs of error were sued out merely for delay."

In considering the general subject involved here it is well to bear in mind the provisions of Article VIII of the Bill of Rights that "Excessive bail shall not be required, * * * nor cruel and *unusual* punishments inflicted." We desire, also, at this point to comment briefly on the argument of the government that Rule 46(a) (2) of the Criminal Rules was intended to enlarge the discretion of the judge in respect of the matter of refusing or revoking bail. The Rule became effective March 21, 1946. There is nothing either in its language or in its history suggesting a purpose in any way to depart from the established principles long governing the subject.

There remains to inquire whether the existing crisis and the showing on revocation are such as to warrant a departure from the principles stated in the decisions. Since the original allowance of bail in April the military conflict in Korea has developed. The affidavit presented in support of the motion for revocation concerns principally the position taken by Bridges on various matters arising in meetings of Local 10 of the International Longshoremen's and Warehousemen's Union held subsequent to the North Korean invasion.

From the affidavit it appears that on June 28, 1950, a lengthy resolution was introduced in the Local condemning the act of aggression of the North Korean Army and declaring full support for the policies being pursued by the government. At that meeting Bridges, who is president of the International Longshoremen's Union and a member of Local 10, offered a substitute resolution stating the purpose "to support the U. N. order to cease fire and for a return to the status quo and to have that organization settle the dispute peacefully through discussions with all parties concerned in order to avoid a worldwide atomic war." Thereafter, on July 10, a resolution similar to the first introduced was brought up in the Local. Bridges rose to a point of order relative to the vote on his substitute motion at the previous meeting, and the Local's president ruled that his substitute had been defeated at the prior meeting; whereupon Bridges appealed the decision of the chair and the presiding officer's ruling was overwhelmingly sustained. On July 19 thereafter the resolution that had been introduced on July 10 was adopted, and Bridges requested that his statement in opposition to the resolution be inserted in the minutes. The request was granted.

Thereafter at a meeting held on July 26 the Local's president announced that the membership will vote at a coming referendum on whether or not Bridges should resign as honorary president of the World Federation of Trade Unions Maritime Department. (The record does not indicate that a vote on that proposition has been taken.) The report of the July 26 meeting comments on a declaration of the World Federation of Trade Unions in Paris ordering all affiliates to sabotage the American war effort in Korea. At the same meeting of July 26 the Local's president reported on the Security Conference in Washington which he had attended, and offered a statement of policy to the membership for consideration. This statement of policy proposed that government authorities classify and screen as bad security risks known Communists, subversives, or notorious fellow travelers. In view of the Korean situation the Coast Guard contem-

plated a program which would require government clearance of all waterfront and maritime workers. Bridges spoke against this statement of policy, arguing the danger that militant trade unionists would be discriminated against. (In his oral testimony at the revocation hearing Bridges explained that by his expressions he sought to caution the union against any security program which might be applied in such a way as to invalidate union obligations to members or to create hardships for certain members. He further testified that he believed action on a security program of coastwise application should be taken at a coming longshore caucus and not by individual locals.) Due to the lateness of the hour the president ruled that the question should be laid over to a subsequent meeting.

At the July 10 meeting of the Local the Board of Trustees recommended that the union's financial contribution to the Sidney Roger radio program be discontinued because Roger reflected the opinion of left-wing groups. Bridges spoke in favor of continuing the subsidy, stating that Roger "is a propagandist and speaks from the union point of view." The union voted to discontinue subsidy payments in accordance with the trustees' recommendation.

Incorporated in the affidavit dealing with the union proceedings are many exhibits from the newspaper Daily People's World and other publications and releases, introduced for the purpose of indicating the Communist position on the Korean situation. The inference drawn by the government is that these exhibits reveal Bridges' adherence to the party line.

It is our purpose neither to minimize on the one hand nor to exaggerate on the other the possible implications of Bridges' attitude or utterances as disclosed in the government's showing. Depending on the predilections of the person considering the record, it would be easy to do either. We are obliged, however, to point out that there is no showing that Bridges has in the present juncture committed any recognizable crime, or that he has himself counseled or advocated sabotage, or sought to foment strikes or the establishment of picket lines. on the waterfront, or to impede by other means the prompt loading and dispatch of ships for the Far East.

But the government urges that the status. of one who has been released on bail pending appeal should be assimilated to that of the finally convicted person who has been. released on probation; and that bail may be revoked for conduct such as would impel the court to terminate the liberty of a. probationer. It is not claimed that there is any suggestion of such an analogy in the decided cases, nor is it possible for us. to see that the situations have any similarity. Probation is essentially an essay in the direction of self restraint. Its hopeful aim is the ultimate rehabilitation and reformation of the wrongdoer; and many restrictions may be and invariably are imposed on the conduct and activities of the probationer of which other people are entirely free. The sole purpose of bail, however, is to insure the presence of the appellant when his case is finally determined in order that he may, if his conviction is affirmed, be confined pursuant to his sentence.

The whole matter appears finally to boil down to the contention that Bridges is a proven Communist in that he was found guilty of perjury for swearing the contrary in his naturalization proceeding; and that the subsequent development of the Korean crisis renders him per se a menace to the public security, hence the district court was. right in revoking his bail and ordering him confined.

The conclusion, if we may say so, is as startling as it is novel. The power of waging war is lodged by the Constitution in the Congress and the executive branch of the government. In the three great wars in which this country has engaged in the past ninety years the executive arm. has found ways and means of dealing for itself with suspected subversives and those thought foes of the national security. President Lincoln was not slow to take such measures on his own responsibility whenever he thought that course expedient, however little the courts of his day might

like his methods. The examples freshest in the memory of the present generation are the setting up by the executive during the second world war of military rule and the suspension of the writ of habeas corpus in the Territory of Hawaii, plus the enforced removal pursuant to presidential proclamation of the entire Japanese population from the Pacific Coast. But here, in this case, a procedure admittedly without precedent in the history of the Republic has been inaugurated, namely, to make the courts the effective instruments of executive expediency.

There was a period in English history when high judges prostituted themselves to the role of mere instruments for carrying into effect the arbitrary will of the Crown; and the memory of that experience took deep lodgment in the hearts of the English speaking peoples. It was in part owing to those unhappy experiences that in our constitutional system the judiciary was set up as an equal branch of the government, independent both of the executive and the legislative arms. The conception of the founders was of an unfettered judiciary standing, wherever necessary, between the individual and the exercise by the state of arbitrary power.

Inevitably, of course, conditions have arisen and will continue to arise in which the judges are disabled from performing that function, one of these being the onset of war carrying with it the threat of public peril. The power to wage war necessarily includes the power to wage it effectively; and in times of national danger the courts should, and they generally have, refrained from interfering with summary measures of the executive determined by the latter to be essential to the public safety. But it is one thing to refrain from interference and quite another for the courts to become themselves the tools of military expediency; and we say now, with all the emphasis we are able to command, that however hard and disagreeable may be the task in times of popular passion and excitement it is the duty of the courts to set their faces like flint against this erosive subversion of the judicial process. As cogent-

ly observed by Mr. Justice Jackson in Korematsu v. United States, 323 U. S. 214, 245, 247, 65 S.Ct. 193, 207, 89 L.Ed. 194: "In the very nature of things, military decisions are not susceptible of intelligent judicial appraisal. They do not pretend to rest on evidence, but are made on information that often would not be admissible and on assumptions that could not be proved. * * * I should hold that a civil court cannot be made to enforce an order which violates constitutional limitations even if it is a reasonable exercise of military authority. *The courts can exercise only the judicial power, can apply only law, and must abide by the Constitution, or they cease to be civil courts and become instruments of military policy.*" [Emphasis supplied.]

One further observation and we conclude discussion. It seems to be believed that in this instance the end justifies the means. Perhaps we may be pardoned for doubting whether, even as a practical matter, the end sought will be furthered by the means here employed at the behest of the Department of Justice. A Bridges singled out and jailed by arbitrary judicial action while he is prosecuting with diligence his good faith appeal poses, to our minds, a more serious menace to the nation and its institutions than does a Bridges enlarged on bail in accordance with established rules of law and the decisions and practice of the courts. In the eyes of large numbers of well-meaning and loyal people without as well as within the ranks of organized labor, even including many of Bridges' fellow unionists who have heartily disagreed with his policies, he will appear a victim of judicial tyranny; and authentic material for propaganda is supplied for the use of the vociferous critics and implacable foes of our democratic way of life.

The revocation order of the district judge is vacated and set aside, mandate to go down immediately.

MATHEWS, Circuit Judge (dissenting).

Harry Renton Bridges, Henry Schmidt and J. R. Robertson were indicted on May

25, 1949. The indictment was in three counts. Count 1 was based on 18 U.S. C.A. 1940 Edition, § 88.[1] It charged, in substance, that Bridges, Schmidt and Robertson, on or about June 23, 1945, and continuing until on or about October 1, 1945, at San Francisco, California, conspired to defraud the United States by impairing, obstructing and defeating the proper administration of its naturalization laws by having Bridges fraudulently petition for and obtain naturalization in a naturalization proceeding in the Superior Court of the State of California in and for the City and County of San Francisco and by falsely and fraudulently stating and representing to said court in said proceeding that he had never belonged to the Communist Party, whereas he had, in truth and in fact, belonged to and been a member of the Communist Party from 1933 up to and including September 17, 1945. Count 1 further charged that, to effect the object of said conspiracy, certain acts, which count 1 described, were done by Bridges on or about June 23, 1945, and by Bridges, Schmidt and Robertson on or about August 8, 1945, and September 17, 1945.

Counts 2 and 3 were based on 8 U.S.C.A. 1940 Edition, § 746(a).[2] Count 2 charged, in substance, that Bridges, on September 17, 1945, at San Francisco, California, knowingly made a false statement under oath in the naturalization proceeding mentioned in count 1, namely, a statement to the effect that he had never belonged to the Communist Party, whereas he had, in truth and in fact, belonged to and been a member of the Communist Party from 1933 up to and including September 17, 1945.

Count 3 charged, in substance, that Schmidt and Robertson, on or about September 17, 1945, at San Francisco, California, encouraged, aided, advised and assisted Bridges, a person not entitled thereto, to obtain, accept and receive a certificate of naturalization, knowing the same to have been procured by fraud, said fraud consisting of the false and fraudulent statement and representation mentioned in count 1.

Bridges, Schmidt and Robertson were arraigned, pleaded not guilty and had a jury trial, District Judge George B. Harris presiding. The trial began on November 14, 1949, and ended on April 10, 1950, when the jury returned a verdict finding Bridges guilty as charged in counts 1 and 2 and finding Schmidt and Robertson guilty as charged in counts 1 and 3. Thereupon a judgment was entered, sentencing Bridges to be imprisoned for five years and sentencing Schmidt and Robertson to be imprisoned for two years. From that judgment Bridges, Schmidt and Robertson appealed. Thereafter, on April 10, 1950, Judge Harris allowed Bridges bail pending appeal and ordered him admitted to bail pending appeal in the sum of $25,000.

On July 31, 1950, the Government filed in the District Court a motion to revoke the order admitting Bridges to bail. In

1. Section 88 provided: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to the conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both." Cf. 18 U.S.C.A., 1948 Revision, § 371.

2. Section 746(a) provided:
"(a) It is hereby made a felony for any alien or other person, whether an applicant for naturalization or citizenship, or otherwise, and whether an employee of the Government of the United States or not—
"(1) Knowingly to make a false statement under oath, either orally or in writing, in any case, proceeding, or matter relating to, or under, or by virtue of any law of the United States relating to naturalization or citizenship. * * *
"(5) To encourage, aid, advise, or assist any person not entitled thereto to obtain, accept, or receive any certificate of arrival, declaration of intention, certificate of naturalization, or certificate of citizenship, or other documentary evidence of naturalization or of citizenship—
"a. Knowing the same to have been procured by fraud; * * * *". Cf. 18 U.S.C.A. 1948 Revision, § 1015(a).

support of the Government's motion, an affidavit of John H. McGowan, an investigator for the Immigration and Naturalization Service, was filed on August 2, 1950. Twenty-six exhibits were attached to and made a part of the affidavit. The Government's motion was presented to and heard by Judge Harris. The hearing began on August 2, 1950, and ended on August 5, 1950. At the conclusion of the hearing, Judge Harris delivered from the bench an oral opinion[3] and thereupon, on August 5, 1950, made an order granting the Government's motion and revoking the order admitting Bridges to bail.

On August 8, 1950, Bridges filed in this court a motion to vacate the order revoking the order admitting him to bail. Bridges' motion was heard by and submitted to this court on August 8, 1950. My associates think that Bridges' motion should be granted and have so ordered. I dissent for the following reasons:

Rule 46(a) (2) of the Federal Rules of Criminal Procedure provides: "Bail may be allowed pending appeal or certiorari only if it appears that the case involves a substantial question which should be determined by the appellate court. Bail may be allowed by the trial judge or by the appellate court or by any judge thereof or by the circuit justice. The court or the judge or justice allowing bail may at any time revoke the order admitting the defendant to bail." This rule became effective on March 21, 1946, and has been in effect ever since. It has the force and effect of law.

In revoking the order admitting Bridges to bail, Judge Harris acted under and pursuant to the final provision of Rule 46(a) (2)—the provision that "The court or the judge or justice allowing bail may at any time revoke the order admitting the defendant to bail." This provision is clear and unambiguous. It means exactly what it says. Having the force and effect of law, it should be recognized and treated as such and should not be ignored or disregarded.

Rule 46(a) (2) does not specify the ground or grounds on which an order admitting a defendant to bail may be revoked. I assume, however, that, to warrant revocation of such an order, some good ground must be shown. The ground stated in the Government's motion to revoke the order admitting Bridges to bail was that, after being admitted to bail, he had pursued, and if permitted to remain at large, would continue to pursue, "a course of conduct and activities dangerous and detrimental to the public welfare and inimical to the safety and national security of the United States." That, if true, was, in my opinion, a good ground for such revocation.

The power to revoke an order admitting a defendant to bail is a discretionary power. Therefore, unless Judge Harris abused his discretion in revoking the order admitting Bridges to bail, the order of revocation should not be vacated. I cannot say that Judge Harris abused his discretion. Instead, I believe that he exercised it wisely and properly. My reason for so believing are as follows:

In finding Bridges guilty as charged in counts 1 and 2 of the indictment and in finding Schmidt and Robertson guilty as charged in counts 1 and 3 of the indictment, the jury necessarily found that Bridges was a member of the Communist Party. That finding was amply supported by evidence. The evidence taken at the trial of Bridges, Schmidt and Robertson showed or strongly tended to show, not only that Bridges was a Communist Party member from 1933 up to and including September 17, 1945, as charged in the indictment, but that he was a Communist Party member from 1933 up to and including the time of the trial. There was no evidence that he renounced his Communist Party membership or ceased to be a Communist Party member after the trial. Instead, the McGowan affidavit showed or strongly tended to show that Bridges was still a Communist Party member when the Government moved to revoke the order

---

3. United States v. Bridges, D.C.N.D.Cal. 93 F.Supp. 989. A court reporter's transcript of Judge Harris' oral opinion was filed on August 7, 1950.

admitting him to bail. Judge Harris found, and was warranted in finding, that Bridges was still a Communist Party member when that order was revoked.

The Communist Party is a conspiracy, one object of which is to overthrow the Government of the United States by force and violence. Communist Party members are parties to that conspiracy. The Communist Party is dominated and controlled by Soviet Russia. Communist Party members are servants and agents of Soviet Russia.

For several years next preceding June 25, 1950, the United States was engaged in a so-called "cold" war with Soviet Russia. The so-called "cold" war became a "shooting" war on June 25, 1950, when Soviet Russia's North Korean Communist Army invaded South Korea, and the armed forces of the United States were ordered by the President to repel the invasion. The "shooting" war has continued since June 25, 1950. When it will end, nobody knows.

Since June 25, 1950, American ships carrying men, munitions and supplies to the Korean war front have been moving, and such ships must continue to move, from Pacific Coast ports of the United States. Employed at these ports are thousands of workers (longshoremen and others) who belong to local unions affiliated with, and subsidiaries of, the International Longshoremen's and Warehousemen's Union, hereafter called I.L.W.U., of which Bridges is and has been for many years the president and directing head. This is a position of great power and influence. A Communist Party member could wish no better position from which to sabotage the American war effort and to give aid and comfort to his North Korean Communist comrades. The danger here suggested is not a fanciful one. The ability of Bridges and his I.L.W.U. to paralyze Pacific Coast shipping has been demonstrated more than once.

Thus, by and through his I.L.W.U., Bridges could, while at large, pursue "a

course of conduct and activities dangerous and detrimental to the public welfare and inimical to the safety and national security of the United States." The McGowan affidavit showed or strongly tended to show, not merely that Bridges could pursue such a course, but that he had, in fact, done so since June 25, 1950, and, if permitted to remain at large, would continue to do so. Judge Harris, in effect, so found. I quote from his opinion:[4]

"I am satisfied to a moral certainty and beyond a reasonable doubt that Harry Bridges was and is a member of the Communist Party. * * * I am also led to believe from the extensive proceedings before me involving this defendant that he is probably one of the most potent figures in the Communist Party in America today. As such a member, he is an agent dedicated to execute the Communist program, both nationally and internationally. As such agent, his allegiance is not and cannot be to the United States of America—notwithstanding his plaint to the contrary and his studied misconceptions as to his loyalty.

"His conduct since the inception of the recent hostilities in Korea, as well as his equivocal testimony in this proceeding,[5] are of such nature as to justify this court in concluding that when the welfare of this country and its armed forces are at stake, as opposed to a Communist regime, that his loyalty is and must be with the Communists. * * *

" * * * Mr. Bridges has spearheaded, since his release on bail, and within recent date, a serious opposition to security measures, including a 'Security Conference Statement of Policy,' which was designed to protect the people of San Francisco, its ports and the welfare of our armed forces. In my opinion, such opposition was taken by him solely for the purpose of protecting the Communist Party and his Communist cohorts within the union, and not for the benefit of the rank and file or the country as a whole.

4. United States v. Bridges, supra.

5. At the hearing on the Government's motion, Bridges testified as a witness for himself.

"Of equal significance was his refusal to disavow affiliation in and with the World Federation of Trade Unions,[6] an international organization which he admits * * * is controlled and dominated by Communists. In a bulletin of July 12, 1950, the World Federation of Trade Unions called all affiliated organizations[7] to 'take all immediate and indispensable action to defeat the diabolical plans of the American war mongers and to support their brother unionists in Korea who are fighting alongside the whole Korean people for liberation of their country.' * * *

"Mr. Bridges' weak and vacillating explanation was that future possible economic and other support from the Communist organization justified him in continuing the membership and 'that we should not be too hasty to cut off all our ties, as we may need them at some future date.'

"I say that adherence to the program of the World Federation of Trade Unions, as delineated in the form in which I have just read, is traitorous. * * *

"It is manifest to this court that since his conviction, Mr. Bridges has openly, consistently and vigorously followed the Communist Party line, as particularly outlined in the Government's affidavit.[8] His denials in this respect on the witness stand were not convincing to the court. * * *

"This is not a time for divided loyalty. In answer to counsel's contention that the granting of bail is essential for the protection of his right to appeal, I simply say that he has deliberately forfeited such claim to be admitted to bail, and that his brazen conduct is opposed to the welfare of our Government in this period of crisis and emergency."

The findings and conclusions stated in Judge Harris' opinion were amply warranted. I therefore cannot say that he erred in revoking the order admitting Bridges to bail. Much less can I say that he abused his discretion.

The motion to vacate the order of revocation should be denied.

---

6. Bridges was president of the International Union of Seamen and Dockers (now called the Maritime and Port Workers' Trade Union International), a subsidiary of the World Federation of Trade Unions.

7. Bridges' I.L.W.U. was one of the "affiliated organizations."

8. The McGowan affidavit mentioned above.