CARLSON ET AL. *v.* LANDON, DISTRICT
DIRECTOR OF IMMIGRATION AND
NATURALIZATION SERVICE.

NO. 35.

Argued November 26, 1951.—Decided March 10, 1952.

*John T. McTernan* argued the cause and *John W. Porter, Ben Margolis, Carol King* and *A. L. Wirin* filed a brief for petitioners in No. 35.

*John F. Davis* argued the cause for petitioner in No. 136 and respondent in No. 35. With him on the briefs were *Solicitor General Perlman, Assistant Attorney General McInerney* and *Beatrice Rosenberg.*

*Carol King* argued the cause for respondent in No. 136. With her on the brief was *Alan N. Brown.*

Mr. Justice Reed delivered the opinion of the Court.

These cases present a narrow question with several related issues. May the Attorney General, as the executive head of the Immigration and Naturalization Service,[1] after taking into custody active alien Communists on warrants,[2] charging either membership in a group that ad-

---

[1] Reorganization Plan No. V, 54 Stat. 1238.

[2] Sec. 19 of an Act to regulate the immigration of aliens to, and the residence of aliens in, the United States, 39 Stat. 889, February 5, 1917, as amended 8 U. S. C. § 155:

". . . any alien who shall have entered or who shall be found in the United States in violation of this chapter, or in violation of any other law of the United States; . . . shall, upon the warrant of the Attorney General, be taken into custody and deported. . . ."

vocates the overthrow by force of this Government [3] or inclusion in any prohibited classes of aliens,[4] continue them in custody without bail, at his discretion pending determination as to their deportability, under § 23 of the

[3] Act of October 16, 1918, 40 Stat. 1012, as amended, 8 U. S. C. (1946 ed.) § 137, see note 15, *infra:*

"(c) Aliens who believe in, advise, advocate, or teach, or who are members of or affiliated with any organization, association, society, or group, that believes in, advises, advocates, or teaches: (1) the overthrow by force or violence of the Government of the United States or of all forms of law. . . ."

[4] Internal Security Act of 1950, September 23, 1950, § 22, subsection 4 (a), amending the Act of October 16, 1918, see 8 U. S. C. § 137:

"Any alien who was at the time of entering the United States, or has been at any time thereafter, a member of any one of the classes of aliens enumerated in section 1 (1) or section 1 (3) of this Act or . . . a member of any one of the classes of aliens enumerated in section 1 (2) of this Act, shall, upon the warrant of the Attorney General, be taken into custody and deported in the manner provided in the Immigration Act of February 5, 1917. The provisions of this section shall be applicable to the classes of aliens mentioned in this Act, irrespective of the time of their entry into the United States."

*Id.,* § 22:

"That any alien who is a member of any one of the following classes shall be excluded from admission into the United States:

"(1) Aliens who seek to enter the United States whether solely, principally, or incidentally, to engage in activities which would be prejudicial to the public interest, or would endanger the welfare or safety of the United States;

"(2) Aliens who, at any time, shall be or shall have been members of any of the following classes:

"(A) Aliens who are anarchists;

"(B) Aliens who advocate or teach, or who are members of or affiliated with any organization that advocates or teaches, opposition to all organized government;

"(C) Aliens who are members of or affiliated with (i) the Communist Party of the United States, (ii) any other totalitarian party of the United States, (iii) the Communist Political Association, (iv) the Communist or other totalitarian party of any State of the United States, of any foreign state; or of any political or geographical sub-

Internal Security Act?[5] Differing views of the Courts of Appeals led us to grant certiorari. 342 U. S. 807, 810.

I. *Facts.*—The four petitioners in case No. 35 were arrested under warrants, issued after the enactment of the Internal Security Act of 1950, charging each with being an alien who was a member of the Communist Party of the United States.[6] The warrants directed that they be held in custody,[7] pending determination

---

division of any foreign state; (v) any section, subsidiary, branch, affiliate, or subdivision of any such association or party; or (vi) the direct predecessors or successors of any such association or party, regardless of what name such group or organization may have used, may now bear, or may hereafter adopt;

.        .        .        .        .

"(F) Aliens who advocate or teach or who are members of or affiliated with any organization that advocates or teaches (i) the overthrow by force or violence or other unconstitutional means of the Government of the United States or of all forms of law; . . . .

.        .        .        .        .

"(3) Aliens with respect to whom there is reason to believe that such aliens would, after entry, be likely to (A) engage in activities which would be prohibited by the laws of the United States relating to espionage, sabotage, public disorder, or in other activity subversive to the national security; (B) engage in any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unconstitutional means; or (C) organize, join, affiliate with, or participate in the activities of any organization which is registered or required to be registered under section 7 of the Subversive Activities Control Act of 1950."

[5] Internal Security Act of 1950, § 23:

". . . Pending final determination of the deportability of any alien taken into custody under warrant of the Attorney General, such alien may, in the discretion of the Attorney General (1) be continued in custody; or (2) be released under bond in the amount of not less than $500, with security approved by the Attorney General; or (3) be released on conditional parole. . . ."

[6] See § 22 (1), Internal Security Act, note 4, *supra.*

[7] See note 5, *supra.*

of deportability.[8] Petitions for habeas corpus were promptly filed alleging that the detention without bond was in violation of the Due Process Clause of the Fifth Amendment [9] and the Eighth Amendment to the Constitution of the United States, and that § 20 of the Immigration Act, as amended, was also unconstitutional. See note 5, *supra*. The allegation appears below.[10]

Respondent filed returns defending his orders of detention on the ground that there was reasonable cause to believe that petitioners' release would be prejudicial to the public interest and would endanger the welfare and safety of the United States. These returns were countered by petitioners with allegations of their many years' residence spent in this country without giving basis for fear of action by them inimical to the public welfare during the pendency of their deportation proceedings,

---

[8] Before the passage of the Internal Security Act the four petitioners had been arrested and admitted to bail on warrants charging membership in groups advocating the overthrow of the Government by force and violence. In our view of the issues now here, these former happenings are immaterial to our consideration of this writ of certiorari.

[9] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

[10] "That section 20 of the Immigration Act of February 5, 1917, as amended by section 23 of Public Law 831, 81st Congress (commonly known as Subversive Activities Control Act of 1950) and section 1 of the Act of October 16, 1918 (8 U. S. C. 137), as amended, are, and each of them is, unconstitutional and void in that they deprive persons, including petitioner, of liberty and property without due process of law, in violation of the Fifth Amendment to the Constitution of the United States in that they abridge the freedom of persons, including petitioner, of speech, the press and assembly and the right to petition the government for redress of grievances, in violation of the First Amendment to the Constitution of the United States, and in that they purport to authorize indefinite detention of persons, including petitioner, without bond prior to final determination of deportability."

their integration into community life through marriage and family connections, and their meticulous adherence to the terms of previous bail, allowed under a former warrant charging deportability. See note 8, *supra*. On consideration of these undenied allegations, the trial court determined that the Director had not been shown to have abused his discretion.[11] This order was reversed on the ground that the Director "must state some fact upon which a reasonable person could logically conclude that the denial of bail is required to protect the country or to secure the alleged alien's presence for deportation should an order to that effect be the result of the hearing." [12]

On rehearing, the Director made allegation, supported by affidavits, that the Service's dossier of each petitioner contained evidence indicating to him that each was at the time of arrest a member of the Communist Party of the United States and had since 1930 participated or was then actively participating in the Party's indoctrination of others to the prejudice of the public interest. There was no denial of these allegations by any of the petitioners, except Hyun, or any assertion that any of them had completely severed all Communist affiliations or connections.[13] As to Hyun the denial was formal and did not include any affidavit denying the facts stated in the Director's affidavit. As the allegations are set out by the Court of Appeals in the carefully detailed opinion of Circuit Judge Stephens, we refrain from any further re-

---

[11] *Carlson* v. *Landon,* 186 F. 2d 183, 186; *Stevenson* v. *Landon,* 186 F. 2d 190.

[12] *Id.,* at 189.

[13] 28 U. S. C. § 2248:

"The allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."

statement here.[14]   The Court of Appeals affirmed the District Court's determination that there was substantial evidence to support the discretion exercised in denying bail.

Respondent Zydok, in case No. 136, was arrested in August 1949 under a recent warrant charging that he was subject to deportation as an alien with membership in an organization advocating the violent overthrow of the Government.   Act of October 16, 1918, as amended, 8 U. S. C. (1946 ed.) § 137.   At that time he was released on $2,000 bail.   Later a deportation hearing was held by the Immigration and Naturalization Service but this Court's decision in *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, necessitated a second deportation hearing.

After the effective date, September 23, 1950, of the Internal Security Act of 1950, respondent was again taken into custody by petitioner on the 1949 warrant, pursuant to radiogram direction from the Acting Commissioner of Immigration and Naturalization referring to § 20 of the Immigration Act of 1917, as amended by § 23 of the Internal Security Act.   The respondent was held without bail by petitioner under an order from the Acting Commissioner of Immigration.   The rearrest was based on § 22 of the Internal Security Act of 1950 which provides for the deportation of aliens who are members of or affiliated with the Communist Party.   8 U. S. C. (Supp. IV) § 137.

Thereupon respondent filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Michigan, challenging the validity of his detention without bail.   The District Court found that petitioner was an alien and had been and was on arrest a member of the Communist Party.   The court determined

---

[14] *Carlson* v. *Landon,* 187 F. 2d 991.

that there had been no abuse of administrative discretion in refusing bail and denied the petition for habeas corpus.[15]

The Court of Appeals for the Sixth Circuit reversed the District Court, holding that in determining denial of bail the Attorney General could not rest on membership alone in the Communist Party but was under the duty to consider also the likelihood that the alien would appear when ordered to do so under the circumstances as developed in the habeas corpus hearing. The court thought the failure of the Attorney General to allow bail was an abuse of discretion.

That court agreed that the District Court was correct in finding that Zydok was a member of the Communist Party and had been in 1949 the financial secretary of its Hamtramck Division. The respondent's testimony justifies the District Court's finding set out in the margin.[16] The record shows other information in the files of the Attorney General, such as attendance at closed meetings of the Party and the Michigan State Convention. The opinion succinctly sets out the facts concerning respondent's integration into American life. We adopt that statement.[17] It was said:

"Discretion does not mean decision upon one particular fact or set of facts. It means rather a just

---

[15] Quite properly, we think, no question is raised as to the applicability of the Internal Security Act amendments relating to membership in the Communist Party and allowance of bail, notes 4 anu 5, *supra,* to detention under a warrant based on 8 U. S. C. (1946 ed.) § 137 (c), note 3, *supra.* Cf. Internal Security Act, 64 Stat. 987, Title I, § 2.

[16] "That the petitioner, while under cross-examination by the Chief Assistant United States Attorney, was a consistently evasive witness and his evasive demeanor in testifying in relation to his communistic activities convinces this Court that he is knowingly and wilfully participating in the Communist movement."

[17] 187 F. 2d at 803:

"Appellant was seventeen years of age when he arrived in this country from Poland in 1913. Since then he has lived continuously

and proper decision in view of all the attending circumstances. The Styria v. Morgan, 186 U. S. 1, 9, 22 S. Ct. 731, 46 L. Ed. 1027. There are many circumstances which involve decision." 187 F. 2d 802, 803.

The Court of Appeals concluded:

"We think that a fair consideration of the factors above set out in their aggregate require that appellant should have been granted bail in some reasonable amount. This view is more nearly in accordance with the spirit of our institutions as it relates even to those who seek protection from the laws which they incongruously seek to destroy. See Carlson v. Landon, Dist. Director, 9 Cir., 186 F. 2d 183; United States ex rel. Potash v. Dist. Director, 2 Cir., 169 F. 2d 747, 752." *Id.*, at 804.

II. *The Issues.*—Petitioners in No. 35, the *Carlson* case, and respondent in No. 136, the *Zydok* case, seek respectively reversal or affirmance principally on the same grounds. It is urged that the denial of bail to each was arbitrary and capricious, a violation of the Fifth Amend-

---

in the State of Michigan. He has been a waiter in an English speaking restaurant in Hamtramck, Mich., for seventeen years and for a great part of that time he was head waiter. He owns his own home in Detroit and has a family consisting of his wife, two sons, a daughter, and five grandchildren. Both sons served in the armed services of the United States in World War II. His children and grandchildren were born in this country and his daughter married here. During World War II while appellant was head waiter in the restaurant he sold about $50,000.00 worth of U. S. War Bonds and during that period he donated blood on seven occasions to the Red Cross for the United States Army.

"Before his second arrest and while he was at large on bail he reported regularly to the Department of Immigration and Naturalization Service. The record fails to disclose that he has violated any law or that he is engaged or is likely to engage in, any subversive activities."

ment; that where there is no evidence to justify a fear of unavailability for the hearings or for the carrying out of a possible judgment of deportation, denial of bail under the circumstances of these cases is an abuse of discretion and violates a claimed right to reasonable bail secured by the Eighth Amendment to the Constitution. Zydok urges, also, that there was an abuse of discretion in rearresting him, when there was no change of circumstances, after his previous release under bond on the same warrant. There are other minor contentions as to irregularities in the proceedings that appear to us immaterial to our consideration of these cases.

The basis for the deportation of presently undesirable aliens resident in the United States is not questioned and requires no reexamination. When legally admitted, they have come at the Nation's invitation, as visitors or permanent residents, to share with us the opportunities and satisfactions of our land. As such visitors and foreign nationals they are entitled in their persons and effects to the protection of our laws. So long, however, as aliens fail to obtain and maintain citizenship by naturalization, they remain subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain within our borders.[18]

Changes in world politics and in our internal economy bring legislative adjustments affecting the rights of various classes of aliens to admission and deportation.[19] The

---

[18] *Nishimura Ekiu* v. *United States*, 142 U. S. 651, 659; *Fong Yue Ting* v. *United States*, 149 U. S. 698, 707; *Bugajewitz* v. *Adams*, 228 U. S. 585; *Ng Fung Ho* v. *White*, 259 U. S. 276, 280; *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 318; *Eichenlaub* v. *Shaughnessy*, 338 U. S. 521, 528; III Hackworth's Digest of International Law 725 (1942).

[19] For example compare Act of December 17, 1943, 57 Stat. 600, with Act of May 6, 1882, 22 Stat. 58.

passage of the Internal Security Act of 1950 marked such a change of attitude toward alien members of the Communist Party of the United States. Theretofore there was a provision for the deportation of alien anarchists and other aliens, who are or were members of organizations devoted to the overthrow by force and violence of the Government of the United States, but the Internal Security Act made Communist membership alone of aliens a sufficient ground for deportation.[20] The reasons for the exercise of power are summarized in Title I of the Internal Security Act. It is sufficient here to print § 2 (15).[21] We have no doubt that the doctrines and practices of

[20] See note 4, *supra*. The extension of the proscription of residence to aliens believing in the overthrow of Government by force or violence has been progressive, as can be readily observed by following the successive enactments of laws to regulate the residence of aliens since the Act of February 5, 1917, 39 Stat. 874. See 8 U. S. C. §§ 137 and 155.

[21] "(15) The Communist movement in the United States is an organization numbering thousands of adherents, rigidly and ruthlessly disciplined. Awaiting and seeking to advance a moment when the United States may be so far extended by foreign engagements, so far divided in counsel, or so far in industrial or financial straits, that overthro·7 of the Government of the United States by force and violence may seem possible of achievement, it seeks converts far and wide by an extensive system of schooling and indoctrination. Such preparations by Communist organizations in other countries have aided in supplanting existing governments. The Communist organization in the United States, pursuing its stated objectives, the recent successes of Communist methods in other countries, and the nature and control of the world Communist movement itself, present a clear and present danger to the security of the United States and to the existence of free American institutions, and make it necessary that Congress, in order to provide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to guarantee to each State a republican form of government, enact appropriate legislation recognizing the existence of such world-wide conspiracy and designed to prevent it from accomplishing its purpose in the United States."

Communism clearly enough teach the use of force to achieve political control to give constitutional basis, according to any theory of reasonableness or arbitrariness, for Congress to expel known alien Communists under its power to regulate the exclusion, admission and expulsion of aliens.[22] Congress had before it evidence of resident aliens' leadership in Communist domestic activities sufficient to furnish reasonable ground for action against alien resident Communists. The bar against the admission of Communists cannot be differentiated as a matter of power from that against anarchists upheld unanimously half a century ago in the exclusion of Turner.[23] Since "[i]t is thoroughly established that Congress has power to order the deportation of aliens whose presence in the country it deems hurtful," [24] the fact that petitioners, and respondent Zydok, were made deportable after entry is immaterial. They are deported for what they are now, not for what they were.[25] Otherwise, when an alien once legally became a denizen of this country he could not be deported

---

[22] I Trotsky, History of the Russian Revolution, 106, 120, 141, 144, 151; Lenin, Collected Works (1930), Vol. XVIII, pp. 279–280; Lenin, The State and Revolution, August, 1917, Foreign Languages Publishing House, Moscow (1949), 28, 30, 33. Translations furnished indicate the same attitude on the part of Stalin. Collected Works, Vol. I, pp. 131–137, 185–205, 241–246; Vol. III, pp. 367–370. And see Leites, The Operational Code of the Politburo (1950), c. xiii, "Violence." See also Immigration and Naturalization Systems of the United States, S. Rep. No. 1515, 81st Cong., 2d Sess., Senate Committee on the Judiciary, Part 3, Subversives, c. I, B, Alien Control; c. II, C, Deportation of Subversive Aliens.

[23] *Turner* v. *Williams*, 194 U. S. 279; *Schneiderman* v. *United States*, 320 U. S. 118, MR. JUSTICE DOUGLAS concurring at 165.

[24] *Bugajewitz* v. *Adams*, 228 U. S. 585, 591; *Ng Fung Ho* v. *White*, 259 U. S. 276, 280.

[25] *Mahler* v. *Eby*, 264 U. S. 32, 39:

"[Congress] was, in the exercise of its unquestioned right, only seeking to rid the country of persons who had shown by their career that

for any reason of which he had not been forewarned at the time of entry. Mankind is not vouchsafed sufficient foresight to justify requiring a country to permit its continuous occupation in peace or war by legally admitted aliens, even though they never violate the laws in effect at their entry. The protection of citizenship is open to those who qualify for its privileges. The lack of a clause in the Constitution specifically empowering such action has never been held to render Congress impotent to deal as a sovereign with resident aliens.[26]

III. *Constitutionality.*—A. *Arbitrary, capricious, abuse of discretion.*—The power to expel aliens, being essentially a power of the political branches of government, the legislative and executive, may be exercised entirely through executive officers, "with such opportunity for judicial review of their action as Congress may see fit to authorize or permit." This power is, of course, subject to judicial intervention under the "paramount law of the Constitution."[27]

Deportation is not a criminal proceeding and has never been held to be punishment. No jury sits. No judicial review is guaranteed by the Constitution.[28] Since deportation is a particularly drastic remedy where aliens have

---

their continued presence here would not make for the safety or welfare of society." See also *Eichenlaub* v. *Shaughnessy,* 338 U. S. 521, 530. Compare *Harisiades* v. *Shaughnessy,* 342 U. S. 580, decided today.

[26] *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304, 318.

[27] *Fong Yue Ting* v. *United States,* 149 U. S. 698, 713–715, 728; *Nishimura Ekiu* v. *United States,* 142 U. S. 651, 659; *The Japanese Immigrant Case,* 189 U. S. 86, 97; *Zakonaite* v. *Wolf,* 226 U. S. 272; *Wong Wing* v. *United States,* 163 U. S. 228, 231.

A claim of citizenship has protection. *Ng Fung Ho* v. *White,* 259 U. S. 276.

[28] *Turner* v. *Williams,* 194 U. S. 279, 290–291; *Zakonaite* v. *Wolf,* 226 U. S. 272, 275; *Bugajewitz* v. *Adams,* 228 U. S. 585, 591; *Mahler* v. *Eby,* 264 U. S. 32.

become absorbed into our community life,[29] Congress has been careful to provide for full hearing by the Immigration and Naturalization Service before deportation. Such legislative provision requires that those charged with that responsibility exercise it in a manner consistent with due process.[30] Detention is necessarily a part of this deportation procedure. Otherwise aliens arrested for deportation would have opportunities to hurt the United States during the pendency of deportation proceedings. Of course purpose to injure could not be imputed generally to all aliens subject to deportation, so discretion was placed by the 1950 Act in the Attorney General to detain aliens without bail, as set out in note 5, *supra*.[31]

The change in language seems to have originated in H. R. 10, 81st Cong., 1st Sess., introduced by Representative Sam Hobbs of Alabama on January 3, 1949. It was

---

[29] *Fong Haw Tan* v. *Phelan*, 333 U. S. 6, 10; *Jordan* v. *De George*, 341 U. S. 223, 231.

[30] *The Japanese Immigrant Case*, 189 U. S. 86; *Vajtauer* v. *Commissioner*, 273 U. S. 103.

[31] The former provision read as follows:

". . . Pending the final disposal of the case of any alien so taken into custody, he may be released under a bond in the penalty of not less than $500 with security approved by the Attorney General, conditioned that such alien shall be produced when required for a hearing or hearings in regard to the charge upon which he has been taken into custody, and for deportation if he shall be found to be unlawfully within the United States." 8 U. S. C. (1946 ed.) § 156.

On December 7, 1951, at the request of this Court, the Government furnished us a list of the Bail or Detention Status, as of the period just prior to December 7, of deportation cases, involving subversive charges, pending on the date of the enactment of the Internal Security Act, September 23, 1950. The list indicates that the modest bonds or personal recognizances of the far larger part of the aliens remained unchanged after the bond amendment to the Immigration Act. Of those detained without bond on order of the Service, the courts have released all but a few. It is quite clear from the list that detention without bond has been the exception.

intended to clarify the procedure in dealing with deportees and to "expressly authorize the Attorney General, in his discretion, to hold arrested aliens in custody." [32] The need for clarification arose from varying interpretations of the authority to grant bail under the former bail provision. Note 31, *supra*. In *Prentis* v. *Manoogian*, 16 F. 2d 422, 424, the Court of Appeals for the Sixth Circuit had held that by the earlier provision "Congress intended to grant to the alien a right, and that its failure to follow with some such phrase as 'at the discretion of the commissioner' vests the discretion to avail himself of the opportunity afforded in the alien, and not the discretion to allow bail in the commissioner or director." On the other hand in *United States ex rel. Zapp* v. *District Director*, 120 F. 2d 762, the Court of Appeals for the Second Circuit construed the provision to the contrary. It said:

> "The natural interpretation of the language used, that the alien 'may be released under a bond,' would indicate that the release is discretionary with the Attorney General; and that appears to be borne out by other provisions of this section, as well as other sections of the immigration laws, where the choice of words appears to have significance." P. 765.

In the later case of *United States ex rel. Potash* v. *District Director*, 169 F. 2d 747, the same court applied its *Zapp* opinion to explain that the Service's discretion as to bail was not untrammeled but subject to judicial review. [33] It

---

[32] H. R. Rep. No. 1192, 81st Cong., 1st Sess., p. 6; S. Rep. No. 2239, 81st Cong., 2d Sess., p. 5.

[33] 169 F. 2d at 751:

"The discretion of the Attorney General which we held to exist in the Zapp case is interpreted as one which is to be reasonably exercised upon a consideration of such factors, among others, as the probability of the alien being found deportable, the seriousness of the charge against him, if proved, the danger to the public safety of his presence within the community, and the alien's availability for subsequent

was in the light of these cases that Congress inserted in the bail provisions the phrase "in the discretion of the Attorney General," the lack of which very phrase the *Manoogian* case held made bail a right of the detained alien. The present statute does not grant bail as a matter of right.

The Government does not urge that the Attorney General's discretion is not subject to any judicial review, but merely that his discretion can be overturned only on a showing of clear abuse.[34] We proceed on the basis suggested by the Government. It is first to be observed that the language of the reports is emphatic in explaining Congress' intention to make the Attorney General's exercise of discretion presumptively correct and unassailable except for abuse. We think the discretion reposed in the Attorney General is at least as great as that found by the Second Circuit in the *Potash* case, *supra*, to be in him under the former bail provision. It can only be

---

proceedings if enlarged on bail. However, in any consideration of his denial of bail it should always be borne in mind that the court's opinion as to whether the alien should be admitted to bail can only override that of the Attorney General where the alien makes a clear and convincing showing that the decision against him was without a reasonable foundation." See *U. S. ex rel. Doyle* v. *District Director*, 169 F. 2d 753; *U. S. ex rel. Pirinsky* v. *Shaughnessy*, 177 F. 2d 708; *U. S. ex rel. De Geronimi* v. *Shaughnessy*, 187 F. 2d 896. (This is the only case from the Second Circuit Court of Appeals since the Internal Security Act. It leaves open the question of the reviewability of the Attorney General's action under that Act.)

[34] The proposed bills at one time contained a provision:

"(f) No alien detained under any provision of law relating to the exclusion or expulsion of aliens shall, prior to an unreviewable order discharging him from custody, be released by any court, on bond or otherwise, except pursuant to the order of a Federal court composed of three judges." S. Rep. No. 2239, 81st Cong., 2d Sess., p. 3. This was introduced to allow for possible release from custody pending deportation hearings. *Id.*, at p. 9. The clause did not survive.

overridden where it is clearly shown that it "was without a reasonable foundation."

The four petitioners in the *Carlson* case were active in Communist work. In the *Zydok* case the only evidence is membership in the Party, attendance at closed sessions and the holding of the office of financial secretary of its Hamtramck Division. This evidence goes beyond unexplained membership and shows a degree, minor perhaps in Zydok's case, of participation in Communist activities. As the purpose of the Internal Security Act to deport all alien Communists as a menace to the security of the United States is established by the Internal Security Act itself, Title I, § 2, we conclude that the discretion as to bail in the Attorney General was certainly broad enough to justify his detention of all these parties without bail as a menace to the public interest. As all alien Communists are deportable, like Anarchists, because of Congress' understanding of their attitude toward the use of force and violence in such a constitutional democracy as ours to accomplish their political aims, evidence of membership plus personal activity in supporting and extending the Party's philosophy concerning violence gives adequate ground for detention. It cannot be expected that the Government should be required in addition to show specific acts of sabotage or incitement to subversive action. Such an exercise of discretion is well within that heretofore approved in *Knauff* v. *Shaughnessy,* 338 U. S. 537, 541.[35] There is no

---

[35] Even though we also take into consideration the factor of probable availability for trial, which we do not think is of great significance in cases involving security from Communist activities of alien Communists, the past record of these aliens is far from decisive against the Attorney General's action. The Internal Security Act made membership sufficient for deportation and set up a procedure that could be carried out. § 22 (2) (C), note 4, *supra,* and § 23. Deportation became more likely for alien Communists by these amendments.

evidence or contention that all persons arrested as deport-able under § 22 of the Internal Security Act, note 4, *supra,* for Communist membership are denied bail. In fact, a report filed with this Court by the Department of Justice in this case at our request shows allowance of bail in the large majority of cases. The refusal of bail in these cases is not arbitrary or capricious or an abuse of power. There is no denial of the due process of the Fifth Amendment under circumstances where there is reasonable apprehension of hurt from aliens charged with a philosophy of violence against this Government.

B. *Delegation of Legislative Power.*—This leaves for consideration the constitutionality of this delegation of authority. We consider first the objection to the alleged unbridled delegation of legislative power in that the Attorney General is left without standards to determine when to admit to bail and when to detain. It is familiar law that in such an examination the entire Act is to be looked at and the meaning of the words determined by their surroundings and connections. Congress can only legislate so far as is reasonable and practicable, and must leave to executive officers the authority to accomplish its purpose.[36] Congress need not make specific standards for each subsidiary executive action in carrying out a policy.[37] The bail provision applies to many

---

[36] *Buttfield* v. *Stranahan,* 192 U. S. 470; *Union Bridge Co.* v. *United States,* 204 U. S. 364, 386; *United States* v. *Grimaud,* 220 U. S. 506; *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 421:

"The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply."

[37] *Wayman* v. *Southard,* 10 Wheat. 1, 43–48; *St. Louis, I. M. & S. R. Co.* v. *Taylor,* 210 U. S. 281, 286; *Intermountain Rate Cases,* 234

classes of deportable aliens other than those named in the classes listed in § 22 of the Internal Security Act. See note 4, *supra*.[38] A wide range of discretion in the Attorney General as to bail is required to meet the varying situations arising from the many aliens in this country.[39]

The policy and standards as to what aliens are subject to deportation are, in general, clear and definite. 8 U. S. C. §§ 137 and 155. Specifically when dealing with alien Communists, as in these cases, the legislative standard for deportation is definite. See notes 3 and 4, *supra*. In carrying out that policy the Attorney General is not left with untrammeled discretion as to bail. Courts review his determination. Hearings are had, and he must justify his refusal of bail by reference to the legislative scheme to eradicate the evils of Communist activity. The legislative judgment of evils calling for the 1950

U. S. 476, 486–489; *Fahey* v. *Mallonee*, 332 U. S. 245, 249. See *Yakus* v. *United States*, 321 U. S. 414, 424–425:

"The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct . . . . These essentials are preserved when Congress has specified the basic conditions of fact upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective. It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework."

[38] Any alien becoming a public charge within five years of entry may be subject to deportation. Likewise any alien sentenced more than once for any crime involving moral turpitude, and certain illegal entrants. See 8 U. S. C. § 155.

[39] Approximately 85,000,000 people, citizens and aliens, are said to have crossed our borders in the 1949 fiscal year. Some many times. Five million aliens are reported to have registered under the Alien Registration Act of 1940. S. Rep. No. 1515, pp. 630–631, *supra*, n. 22.

amendments to deportation legislation is set out in the introductory sections of the Subversive Activities Control Act.[40] So far as pertinent to these proceedings, the new legislation was designed to eliminate the subversive activities of resident aliens who seek to inculcate the doctrine of force and violence into the political philosophy of the American people. To this end provision was made for the detention and deportation of certain noncitizens, including members of the Communist Party. When in the judgment of the Attorney General an alien Communist may so conduct himself pending deportation hearings as to aid in carrying out the objectives of the world communist movement, that alien may be detained. Compare *Yakus* v. *United States,* 321 U. S. 414, and *Bowles* v. *Willingham,* 321 U. S. 503, 515. This is a permissible delegation of legislative power because the executive judgment is limited by adequate standards. The authority to detain without bail is to be exercised within the framework of the Subversive Activities Control Act to guard against Communist activities pending deportation hearings. Cf. *Mahler* v. *Eby,* 264 U. S. 32, 40. We do not see that such discretion violates the Due Process Clause of the Fifth Amendment.

C. *Violation of Eighth Amendment.*—The contention is also advanced that the Eighth Amendment to the Constitution, note 9, *supra,* compels the allowance of bail in a reasonable amount. We have in the preceding sections of this opinion set out why this refusal of bail is not an abuse of power, arbitrary or capricious, and why the delegation of discretion to the Attorney General is not unconstitutional. Here we meet the argument that the Constitution requires by the Eighth Amendment, note 9, *supra,* the same reasonable bail for alien Communists under deportation charges as it accords citizens charged with bail-

---

[40] See for example § 2 (15), quoted above at note 21.

able criminal offenses. Obviously the cases cited by the applicants for habeas corpus fail flatly to support this argument.[41] We have found none that do.

The bail clause was lifted with slight changes from the English Bill of Rights Act.[42] In England that clause has never been thought to accord a right to bail in all cases,[43] but merely to provide that bail shall not be excessive in those cases where it is proper to grant bail. When this clause was carried over into our Bill of Rights, nothing was said that indicated any different concept.[44] The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country. Thus in criminal cases bail is not compulsory where the punishment may be death.[45] Indeed,

---

[41] Attention is called to *United States ex rel. Potash* v. *District Director,* 169 F. 2d 747, 752:

"If the Eighth Amendment to the Constitution is considered to have any bearing upon the right to bail in deportation proceedings, and this has been denied, it is our opinion that the provisions of that Amendment and any requirement of the due process provisions of the Fifth Amendment will be fully satisfied if the standards of fairness and reasonableness we have set forth regarding the exercise of discretion by the Attorney General are observed."

*United States ex rel. Klig* v. *Shaughnessy,* 94 F. Supp. 157, 160:

"It is not unappropriate to refer here to the Eighth Amendment to the Constitution of the United States, one of that series of amendments collectively known as the Bill of Rights, which prohibits the imposition of excessive bail. Certainly, the principle inherent in that amendment applies to deportation proceedings, whether or not such proceedings technically fall within its scope. That principle cannot be reconciled with the government's denial of bail to these relators under the circumstances here set forth."

[42] 1 Wm. & Mary, Sess. 2, c. II, § I (10).

[43] Petersdorff, on Bail, 483 *et seq.*

[44] I Annals of Congress 753.

[45] 1 Stat. 91, § 33; Federal Rules of Criminal Procedure, 46 (a).

Similarly, on appeal from a conviction by the trial court, a defendant is not entitled to bail if he does not present a substantial question. Fed. Rules Crim. Proc., 46 (a)(2); *Bridges* v. *United States,* 184

the very language of the Amendment fails to say all arrests must be bailable. We think, clearly, here that the Eighth Amendment does not require that bail be allowed under the circumstances of these cases.

It should be noted that the problem of habeas corpus after unusual delay in deportation hearings is not involved in this case. Cf. *United States ex rel. Potash* v. *District Director,* 169 F. 2d 747, 751.

IV. *Rearrest.*—Finally, respondent Zydok argues that his rearrest on the outstanding warrant, after he had once been released on bail, was improper. The inquiry on habeas corpus is limited to the propriety of Zydok's present detention. *McNally* v. *Hill,* 293 U. S. 131, 136. While the Attorney General has made a satisfactory showing that he has good cause for detaining Zydok without bail, no order based on a new warrant has been entered.[46] Zydok did not allow the proceedings to run along but objected promptly by habeas corpus to detention under the warrant. It has been said that the rule in criminal cases is that a warrant once executed is exhausted.[47] This guards against precipitate rearrest. Where, however, the rearrest comes after the discovery of error in release, a new warrant is not necessarily required.[48] State cases have held that an escaped person or one who secured his

---

F. 2d 881, 884; *Williamson* v. *United States,* 184 F. 2d 280, 281; *Baker* v. *United States,* 139 F. 2d 721.

In England, there was a series of crimes and situations where the arrested person could "have no other sureties but the four walls of the prison." Blackstone's Commentaries, Book IV, 298.

[46] See *United States ex rel. Bilokumsky* v. *Tod,* 263 U. S. 149, 158, and cases there cited; *Mahler* v. *Eby,* 264 U. S. 32, 45. These cases had valid orders entered subsequent to an invalid arrest.

[47] See *United States ex rel. Heikkinen* v. *Gordon,* 190 F. 2d 16, 19; *Doyle* v. *Russell,* 30 Barb. (N. Y.) 300.

[48] *People ex rel. Wolfe* v. *Johnson,* 230 N. Y. 256, 130 N. E. 286.

release by trick may be rearrested without a new warrant.[49] Although a warrant for rearrest is required by statute, when a convicted person is paroled his status on violation of the parole is the same as that of an escaped prisoner.[50] When a prisoner is out on bond he is still under court control, though the bounds of his confinement are enlarged. His bondsmen are his jailers.[51] While the bailsmen may arrest without warrant, the court proceeds under bench warrant to retake a prisoner. Cf. 18 U. S. C. § 3143.

Although in a civil proceeding for deportation the same branch of government issues and executes the warrant, we think the better practice is to require in those cases also a new warrant.

The judgment of the Court of Appeals in the *Zydok* case will be vacated and the cause remanded to the District Court for further proceedings in accordance with this opinion, with directions to order the release of the respondent Zydok unless within a reasonable time in the discretion of the court he is rearrested under a new warrant.[52]

*No. 35 is affirmed; No. 136 is vacated.*

MR. JUSTICE BLACK, dissenting.

Today the Court holds that law-abiding persons, neither charged with nor convicted of any crime, can be held in jail indefinitely, without bail, if a subordinate Washington bureau agent believes they are members of the Commu-

[49] *Voll* v. *Steele*, 141 Ohio St. 293, 47 N. E. 2d 991. Cf. *Porter* v. *Garmony*, 148 Ga. 261, 96 S. E. 426. Bail once allowed by a magistrate, pending trial, may not in some instances be refused by a higher court. *In re Marshall*, 38 Ariz. 424, 300 P. 1011.

[50] *Anderson* v. *Corall*, 263 U. S. 193, 196.

[51] *Taylor* v. *Taintor*, 16 Wall. 366, 371.

[52] See *Dowd* v. *Cook*, 340 U. S. 206; *Mahler* v. *Eby*, 264 U. S. 32, 45.

nist Party, and therefore dangerous to the Nation because of the possibility of their "indoctrination of others." Underlying this harsh holding are past decisions of this Court declaring that Congress may constitutionally direct the summary deportation of aliens for any reason it sees fit. I agree with MR. JUSTICE DOUGLAS for the reasons he gives in his dissenting opinion in *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 598, that these prior declarations should now be reconsidered and rejected. This would dispose of these cases. But the Court today not only adheres to, but greatly expands the constitutional doctrine of the former cases. The Court also relies on the Internal Security Act of 1950, 64 Stat. 987, for its holding. MR. JUSTICE FRANKFURTER presents strong arguments for construing the Act so as to reach an opposite result. But even if authorized by that Act, as the majority holds, the denial of a right to bail under the circumstances of these cases strikes me as a shocking disregard of the following provisions of the Bill of Rights: Eighth Amendment's ban against excessive bail;[1] First Amendment's ban against abridgment of thought, speech and press;[2] Fifth Amendment's ban against depriving a person of liberty without due process of law.[3] Before a detailed discussion of my several grounds of dissent it is necessary to state the facts and the precise issues the records present.

Respondent Zydok, petitioners Carlson and others were all arrested ("detained") in connection with proceedings which might lead to their deportation. A subordinate of the Commissioner of Immigration, not the

---

[1] "Excessive bail shall not be required, nor excessive fines imposed; nor cruel and unusual punishments inflicted." U. S. Const., Amend. VIII.

[2] "Congress shall make no law . . . abridging the freedom of speech, or of the press; . . . ." U. S. Const., Amend. I.

[3] "No person . . . shall be . . . deprived of life, liberty, or property, without due process of law; . . . ." U. S. Const., Amend. V.

Attorney General, directed that they be held in prison without bail. Of necessity, consideration of these deportation proceedings by bureaus and courts may last for years. Carlson's has already dragged on for over four years. Moreover, even deportation orders at the end of such proceedings might not end their indeterminate jail sentences since the foreign countries to which they are ordered might refuse to admit them. Such refusals have prevented deportation in thousands of cases.[4] Thus denial of bail may well be the equivalent of a life sentence, at least for Zydok, 56 years old, and Carlisle whose health is bad. Such has become the fate of ordinary family people selected and classified, on secret information, as "dangerous" by Washington bureau agents.

Zydok's case illustrates what is happening. He has lived in this country 39 years, owns his home, has violated no law, is "not likely to engage in any subversive activities," has a wife, two sons, a daughter and five grandchildren, all born in the United States. Both sons served in the armed services in World War II. Zydok himself, then a waiter, sold about $50,000 worth of U. S. war bonds and "donated blood on seven occasions to the Red Cross for the United States Army." This jailing of Zydok, despite a patriotic record of which many citizens could well be proud, is typical of what actually happens when public feelings run high against an unpopular minority.

While the Court gives Zydok a momentary technical respite, its holding means that he too, pursuant to the Government's present program, can and will be held in jail without bond as a "dangerous" character. The others, with equally enviable records as law-abiding persons, are not even given a technical respite. Mrs. Stevenson is the wife of a citizen and is the mother of a young man who

[4] 96 Cong. Rec. 10449; H. R. Rep. No. 1192, 81st Cong., 1st Sess., pp. 7, 9, 10.

is also a citizen. Her son has long been subject to attacks of undulant fever. He and his 70-year-old grandmother need Mrs. Stevenson's help as does her husband who does her housework while she is "detained" as "dangerous" to our national security. The District Judge tried to persuade the representatives of the Immigration Bureau and the Attorney General to agree for him to enter an order fixing bail for her and for Mr. Carlisle. His request was refused.

The record does not leave us in doubt as to why bail was denied Mrs. Stevenson, Mr. Carlisle, or any of these allegedly "dangerous" aliens. Denial was not on the ground that if released they might try to evade obedience to possible deportation orders. The District Judge in No. 35 conceded that "there is nothing here to indicate the Government is fearful that they are going to leave the jurisdiction"; he said, "I am not going to release men and women that the Attorney General's office says are security risks"; he also said, "I am not going to turn these people loose if they are Communists, any more than I would turn loose a deadly germ in this community. If that is my duty let the Circuit Court say so and assume that burden." [5] These remarks to counsel show that he kept these people in jail only because he thought Communists, as such, were too dangerous to the Nation to be allowed to associate with other people. The Court of Appeals' denial of bail was also based on the premise that Communists were too dangerous to the Nation to be left out of jail, not on the premise that deportation would be delayed or frustrated by granting bail. 187 F. 2d 991.

---

[5] And the District Judge in No. 35 said "When there is a claim, and I don't know whether it is true or not . . . that these people are security risks and that their release is dangerous to the security of the United States, until that is either disproved or proved I am not going to release them. My first vote in that respect is for the security of the country. We have had 42,000 casualties already."

And the Solicitor General has admitted here that "the only evidence advanced to support their detention without bail was that they had been active in the Communist movement." The majority here also appears to rest on the same basis. It must, unless it is now drawing inferences that some might flee and be unavailable for deportation. As the Government admits, there is not a vestige of support for such an inference.[6] Besides, an alien "who shall willfully fail or refuse to present himself for deportation . . . shall upon conviction be guilty of a felony, and shall be imprisoned not more than ten years . . . ." 64 Stat. 987, 1012.

Thus it clearly appears that these aliens are held in jail without bail for no reason. except that "they had been active in the Communist movement." From this it is concluded that their association with others would so imperil the Nation's safety that they must be isolated from their families and communities. On this premise they would be just as dangerous whether aliens or citizens, deportable or not. Since it is not necessary to keep them in jail to assure their compliance with a deportation order, their imprisonment cannot possibly be intended as an aid to deportation. They are kept in jail solely because a bureau agent thinks that is where Communists should be. A power to put in jail because dangerous cannot be derived from a power to deport. Consequently prior cases holding that Congress has power to deport aliens provide no support at all for today's holding that Con-

---

[6] In this state of the record and particularly in view of the Solicitor General's contrary admission, I am at a loss to understand note 35 in the Court's opinion. It is there intimated that these aliens might flee and be unavailable for deportation. I cannot believe that the Court is resting, or would rest, its approval of denial of bail on a ground which even the Solicitor General had not deemed supportable by the record.

gress has power to authorize bureau agents to put "dangerous" people in jail without privilege of bail.

The stark fact is that if Congress can authorize imprisonment of "alien Communists" because dangerous, it can authorize imprisonment of citizen "Communists" on the same ground. And while this particular bureau campaign to fill the jails is said to be aimed at "dangerous" alien Communists only, peaceful citizens may be ensnared in the process. For the bureau agent is not required to prove that a person he throws in jail is an alien, or a Communist, or "dangerous." The agent need only declare he has reason to believe that such is the case. The agent may be and here apparently was acting on the rankest hearsay evidence. The secret sources of his "information" may have been spies and informers, a class not usually rated as the most reliable by people who have had experience with them.[7] In this record the nearest approach to any identifiable source of information is that some of the jailed persons had admitted past membership in organizations listed by the Attorney General as "Communist," or "Com-

---

[7] "Anonymous informations ought not to be received in any sort of prosecution. It is introducing a very dangerous precedent, and is quite foreign to the spirit of our age." Written near 100 A. D. by Emperor Trajan to Pliny the Younger in response to Pliny's interesting report of his prosecution of Christians. 9 Harvard Classics, 428. Pliny was "in great doubt" even then as to "whether the very profession of Christianity, unattended with any criminal act, or only the crimes themselves inherent in the profession are punishable . . . ." *Supra,* 426. "If they [informers against Christians] succeeded in their prosecution, they were exposed to the resentment of a con-. siderable and active party, to the censure of the more liberal portion of mankind, and to the ignominy which in every age and country, has attended the character of an informer. If, on the contrary, they failed in their proofs, they incurred the severe, and perhaps capital, penalty which, according to a law published by the emperor Hadrian, was inflicted on those who falsely attributed to their fellow-citizens the crime of Christianity." 2 Gibbon, The History of the Decline and Fall of the Roman Empire (Oxford Univ. Press), 107, 108.

munist front." These listings are made by the Attorney General *ex parte* on secret dossiers containing statements from sources that the Attorney General refuses to reveal. A majority of this Court has held that such listings are illegal. *Anti-Fascist Committee* v. *McGrath*, 341 U. S. 123. This alone should be enough to reverse the judgments in No. 35. My own judgment is that Congress has not authorized the Bureau of Immigration to hold people in jail without bond solely because it believes them "dangerous." Nor do I think that Congress has power to grant any such authority even if it had attempted to do so.

*First.* Section 23 of the Internal Security Act, 64 Stat. 987, 1011, provides that "Pending final determination of the deportability of any alien taken into custody under warrant of the Attorney General, such alien may, in the discretion of the Attorney General (1) be continued in custody; or (2) be released under bond in the amount of not less than $500, with security approved by the Attorney General; or (3) be released on conditional parole." I read this language as attempting to authorize the Attorney General to hold aliens without bail within his discretion. I think that means the Attorney General's discretion, not that of a subordinate in the Bureau of Immigration. This record does not show that these people were jailed by virtue of an exercise of discretion by the Attorney General. Decision to put deportable aliens in jail without bond (with very minor exceptions) was made by subordinates in the Bureau of Immigration. I agree with Mr. Justice Frankfurter that this decision to jail aliens en masse was not based on the kind of "discretion" the Act intended. But I further think § 23 should not be construed as permitting the Attorney General to delegate this tremendous power to others.

The Government finds a power to so delegate in provisions of the Alien Registration Act of 1940, 8 U. S. C.

§ 458 (a) and in the President's Reorganization Plan No. 2 of 1950, 5 U. S. C. (Supp. IV) following § 133z–15. These provisions are in such broad general terms that they could be read as allowing the Attorney General to delegate all his discretionary duties. But the gravity of a discretionary power to seize people and keep them in jail without a right of bail warns against implying such an unlimited power to delegate it. It is bad enough to read an Act as vesting even the Nation's chief prosecutor with power to determine what individuals he prosecutes should be held in jail without bail. Delegating and redelegating this dangerous power to subordinates entrusted with duties like those of deputy sheriffs and policemen raises serious procedural due process questions. I am not willing to imply that Congress has granted power to make such delegations which so ominously threaten the liberty of individuals. Consequently, assuming constitutionality of § 23, I would hold that it vests power in the Attorney General alone to decide whether a person should be denied bail.

*Second.* The Fifth Amendment commands that no person shall be deprived of liberty without due process of law. I think this provision has been violated here.

Surely it is not consistent with procedural due process of law for prosecuting attorneys or their law enforcement subordinates to make final determinations as to whether persons they accuse of something shall remain in jail indefinitely awaiting a decision as to the truthfulness of the accusations against them. In effect that was done here. I have already referred to the trial judge's statement in No. 35 that he was not going to release people the Attorney General deemed to be bad security risks. Moreover, the immigration official's mere belief based on statements coming from unidentified persons was accepted by both trial judges as casting on each alleged "alien Communist" the burden of proving he was not a Communist by

clear and convincing evidence. And their refusal to incriminate themselves by denying the immigration officer's suspicions was accepted as sufficient proof to keep them behind the jail doors. I think that condemning people to jail is a job for the judiciary in accordance with procedural "due process of law." [8] To farm out this responsibility to the police and prosecuting attorneys is a judicial abdication in which I will have no part.

*Third.* As previously pointed out, the basis of holding these people in jail is a fear that they may indoctrinate people with Communist beliefs. To put people in jail for fear of their talk seems to me to be an abridgment of speech in flat violation of the First Amendment. I have to admit, however, that this is a logical application of recent cases watering down constitutional liberty of speech.[9] I also realize that many believe that Communists and "fellow travelers" should not be accorded any of the First Amendment's protections. My belief is that we must have freedom of speech, press and religion for all or we may eventually have it for none. I further believe that the First Amendment grants an absolute right to believe in any governmental system, discuss all governmental affairs, and argue for desired changes in the existing order. This freedom is too dangerous for bad, tyrannical governments to permit. But those who wrote and adopted our First Amendment weighed those dangers against the dangers of censorship and deliberately chose the First Amendment's unequivocal command that freedom of assembly, petition, speech and press shall not be abridged. I happen to believe this was a wise choice and that our free way of life enlists such respect and love that

---

[8] See *Mozorosky* v. *Hurlburt,* 106 Ore. 274, 198 P. 556, 15 A. L. R. 1076 and note pp. 1079–1083.

[9] See, *e. g., American Communications Assn.* v. *Douds,* 339 U. S. 382; *Dennis* v. *United States,* 341 U. S. 494; *Feiner* v. *New York,* 340 U. S. 315.

our Nation cannot be imperiled by mere talk. This belief of mine may and I suppose does influence me to protest whenever I think I see even slight encroachments on First Amendment liberties. But the encroachment here is not small. True it is mainly those alleged to be present or past "Communists" who are now being jailed for their beliefs and expressions. But we cannot be sure more victims will not be offered up later if the First Amendment means no more than its enemies or even some of its friends believe it does.

*Fourth.* I think § 23 as construed and as here applied violates the command of the Eighth Amendment that "Excessive bail shall not be required . . . ." Under one of the Government's contentions, which the Court apparently adopts, the Eighth Amendment's ban on excessive bail means just about nothing. That contention is that Congress has power, despite the Amendment, to determine "whether or not bail may be granted, or must be granted, and the Constitution then forbids the exaction of excessive bail . . . ." Under this contention, the Eighth Amendment is a limitation upon judges only, for while a judge cannot constitutionally fix excessive bail, Congress can direct that people be held in jail without any right to bail at all. Stated still another way, the Amendment does no more than protect a right to bail which Congress can grant and which Congress can take away. The Amendment is thus reduced below the level of a pious admonition. Maybe the literal language of the framers lends itself to this weird, devitalizing interpretation when scrutinized with a hostile eye. But at least until recently, it has been the judicial practice to give a broad, liberal interpretation to those provisions of the Bill of Rights obviously designed to protect the individual from governmental oppression. I would follow that practice here. The Court refuses to do so because (1) the English Bill of Rights "has never been thought to accord a right to bail in

all cases . . ." and (2) "in criminal cases bail is not compulsory where the punishment may be death." As to (1): The Eighth Amendment is in the American Bill of Rights of 1789, not the English Bill of Rights of 1689. And it is well known that our Bill of Rights was written and adopted to guarantee Americans greater freedom than had been enjoyed by their ancestors who had been driven from Europe by persecution. See *Bridges* v. *California,* 314 U. S. 252, 264–265. As to (2): It is true bail has frequently been denied in this country "when the punishment may be death." I fail to see where the Court's analogy between deportation and the death penalty advances its argument unless it is also analogizing the offense of indoctrinating talk to the crime of first degree murder.

Another governmental contention is this: "The bail provisions of the Eighth Amendment and of the statutes relating thereto have always been considered as applicable only to criminal proceedings. Since deportation proceedings are not criminal in character, the Eighth Amendment has no application." I reject the contention that this constitutional right to bail can be denied a man in jail by the simple device of providing a "not criminal" label for the techniques used to incarcerate. Imprisonment awaiting determination of whether that imprisonment is justifiable has precisely the same evil consequences to an individual whatever legalistic label is used to describe his plight. Prior to this Amendment's adoption, history had been filled with instances where individuals had been imprisoned and held for want of bail on charges that could not be substantiated. Official malice had too frequently been the cause of imprisonment. The plain purpose of our bail Amendment was to make it impossible for any agency of Government, even the Congress, to authorize keeping people imprisoned a moment longer than was necessary to assure their attendance to answer whatever

legal burden or obligation might thereafter be validly imposed upon them. In earlier days of this country there were fond hopes that the bail provision was unnecessary, that no branch of our Government would ever want to deprive any person of bail. On this subject Mr. Justice Story said, "The provision would seem to be wholly unnecessary in a free government, since it is scarcely possible that any department of such a government should authorize or justify such atrocious conduct." Story on Constitutional Law, 5th ed., Vol. 2, p. 650. Perhaps the word "atrocious" is too strong. I can only say that I regret, deeply regret, that the Court now adds the right to bail to the list of other Bill of Rights guarantees that have recently been weakened to expand governmental powers at the expense of individual freedom.

I am for reversing in No. 35 and affirming in No. 136.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON joins, dissenting.

If the Attorney General, after the Internal Security Act, had made a general ruling that thereafter he would not allow bail to any alien against whom deportation proceedings were started and who was then a member of the Communist Party—an undiscriminating, unindividualized class determination—it would disregard the clear direction of Congress for this Court not to hold that the Attorney General had exceeded the limits of his discretion. It would wilfully disregard the adjudications on bail in deportation cases which preceded the Act and the unambiguous legislative history of the law based upon this judicial history. Congress unequivocally chose not to give nonreviewable discretionary power to the Attorney General to deny bail. In substance though not formally he has made such a general ruling. The records before us disclose that since the Internal Security Act the Attorney

General has in fact followed the general practice of denying bail to all active Communists. Such blanket exercise of the power granted him by the Act calls for review and cannot stand.

The controlling questions in this case are: What standards of discretion does the Internal Security Act of 1950 [1] impose upon the Attorney General in granting or denying bail to persons arrested for deportation proceedings; and has the Attorney General here observed those standards? The Government concedes that Congress made reviewable the discretion of the Attorney General on the bail question. This subjection of the Attorney General's action to judicial scrutiny is not to be formally or lightly exercised. The bill which ultimately became § 23 of the Internal Security Act was initially passed by the House with a provision making absolute and unreviewable the Attorney General's action.[2] The bill as enacted, however, omitted the finality clause; the Attorney General's authority was thus defined: "Pending final determination of the deportability of any alien . . . [he] may, *in the discretion of the Attorney General* (1) be continued in custody; or (2) be released under bond in the amount of not less than $500, with security approved by the Attorney General; or

---

[1] Pub. L. No. 831, 81st Cong., 2d Sess., 64 Stat. 987.

[2] H. R. 10, 81st Cong., 1st Sess. read in relevant part thus: "(g) No court shall have jurisdiction to release on bond or otherwise any alien detained under any provision of law relating to the exclusion or expulsion of aliens at any time prior to a decision of court in his favor which is not subject to further judicial reviews." See 96 Cong. Rec. 10448–10460. H. R. Rep. No. 1192, 81st Cong., 1st Sess. 10–11 had this comment: "The provision is designed to leave the question of releasing an alien from custody in an immigration case entirely in the hands of the Attorney General . . . . It in no way denies the right of any alien to test the legality of his detention through the courts; it merely states that the alien cannot be released by the court until judicial proceedings have been finally terminated in the alien's favor."

(3) be released on conditional parole." [3]   Before the passage of the Act Congress had before it conflicting views of Courts of Appeals: according to *Prentis* v. *Manoogian,* 16 F. 2d 422 (C. A. 6th Cir.), bail was a matter of the alien's right; the Second Circuit ruled that it was a matter within the Attorney General's discretion subject to judicial review.   *United States ex rel. Potash* v. *District Director,* 169 F. 2d 747 (C. A. 2d Cir.).[4]   Congress chose the latter view.   It deserves emphasis that it was discretion that was given the Attorney General, not power to decide arbitrarily.[5]

---

[3] Internal Security Act of 1950, § 23, 64 Stat. 987, 1010, 8 U. S. C. (Supp. IV) § 156 (a) (emphasis added).

[4] H. R. Rep. No. 1192, 81st Cong. 1st Sess. 5–6, commenting on H. R. 10, which made the Attorney General's discretion unreviewable, yet gave "discretion" to the Attorney General, said:

"This [existing law] has often been found to be lacking in clarity and doubtful in purpose when questions have arisen concerning procedure following arrest of an alien, or during the interim between his arrest and his hearing and decision on his case . . . . The committee believes that this bill will greatly simplify such details."

A memorandum from a lawyers' group which was read into the record urged that to make the decision of the Attorney General unreviewable "flouts the recent decision of the circuit court of appeals of the second circuit," citing *United States ex rel. Potash* v. *District Director,* 169 F. 2d 747. 96 Cong. Rec. 10454.

[5] Compare the language "in the discretion of the Attorney General" with the clause "Where the Controller has reasonable grounds to believe," which the Privy Council had before it in *Nakkuda Ali* v. *Jayaratne,* [1951] A. C. 66. It was held, in the judgment of Lord Radcliffe, "that there must in fact exist such reasonable grounds, known to the Controller, before he can validly exercise the power" conferred. And for this reason: "After all, words such as these are commonly found when a legislature or law-making authority confers powers on a minister or official. However read, they must be intended to serve in some sense as a condition limiting the exercise of an otherwise arbitrary power. But if the question whether the

In granting the Attorney General discretion subject to judicial review, Congress legislated against a historical background which gives meaning to bail provisions. Only the other day this Court restated the concept of bail traditional in American thought and reflected in the Constitution:

> "This traditional right to freedom before conviction [or before order for deportation] permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. . . . Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant. . . . To infer from the fact of indictment [or warrant for deportation] alone a need for bail in an unusually high amount is an arbitrary act." *Stack* v. *Boyle,* 342 U. S. 1, 4, 5, 6.

> "The practice of admission to bail, as it has evolved in Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is found convenient to give them a trial. On the contrary, the spirit of the procedure is to enable them to stay out of jail until a trial has found them guilty. . . . Each defendant stands before the bar of justice as an individual. . . . Each accused is entitled to any benefits due to his good record, and misdeeds or a bad record should prejudice only those who are guilty of them." *Id.,* at 7, 8, 9 (concurring opinion).

---

condition has been satisfied is to be conclusively decided by the man who wields the power the value of the intended restraint is in effect nothing. No doubt he must not exercise the power in bad faith: but the field in which this kind of question arises is such that the reservation for the ease of bad faith is hardly more than a formality." *Id.,* at 77.

This historical meaning of "bail," familiar even to laymen, must infuse our interpretation of the words of a Congress of whom, in fact, a majority were lawyers. When Congress provided for bail, within the Attorney General's discretion, for persons arrested for deportation proceedings, it was extending to resident aliens still lawfully in our midst the same privileges that are granted as a matter of course to dangerous criminals. The factors relevant to the exercise of discretion are factors that pertain to each individual as an individual. "Discretion is only to be respected when it is conscious of the traditions which surround it and of the limits which an informed conscience sets to its exercise."[6]

If these aliens, instead of awaiting deportation proceedings, were held for trial under a Smith Act indictment, they could not be denied bail merely because of the indictment. *Stack* v. *Boyle, supra.* Membership in the Communist Party—the charge which is the foundation for the deportation proceedings—is surely not as great a danger as a leading share in a conspiracy to advocate the overthrow of the Government by force, which was the essence of the indictment in *Dennis* v. *United States,* 341 U. S. 494. And the opportunity for "the unhampered preparation of a defense" is quite as important to the alien arrested for deportation proceedings as it is to the Smith Act defendant. We would hesitate to impute to Congress, in the absence of some more explicit command, an intent to make bail more readily available to those held on a serious criminal charge than to those awaiting proceedings to determine the question of deportability. Congress made no such distinction. Instead, it cast the Attorney General's authority in terms descriptive of the

---

[6] Professor Mark De Wolfe Howe in The Nation, Jan. 12, 1952, p. 30.

customary power of commissioners or district judges in admitting to bail.

The factors stated by the Second Circuit in the *Potash* case, *supra,* at 751, which guided the enactment, are presumably the standards which Congress expected to be observed: "The discretion of the Attorney General . . . is to be reasonably exercised upon a consideration of such factors, among others, as the probability of the alien being found deportable, the seriousness of the charge against him, if proved, the danger to the public safety of his presence within the community, and the alien's availability for subsequent proceedings if enlarged on bail."

Congress thus made provision for a fair assurance of each alien's availability in the event he is eventually ordered deported. There is, however, not the slightest indication in the Government's returns or in the records before us that each petitioner's ties to family and community and each one's behavior under an earlier warrant against him do not assure his presence throughout the deportation proceedings and thereafter. The records affirmatively indicate the contrary. Moreover, in deportation cases—as compared, for example, with prosecutions under the Smith Act—the consideration that the individuals concerned may depart from the country is minimized in significance, first, because compulsory departure from the United States is just what they are contesting, and secondly, if they do depart, the purpose of the deportation proceedings is realized.

It would be unfair to Congress to deny that it followed the traditional concept of bail by making "the danger to the public safety of his presence within the community" a criterion for bailability. No less must it be presumed that Congress required that each criterion should be applied in the traditional manner, that is, by individualized application to each alien. In each case, the alien's anticipated personal conduct—and that alone—

must be considered. Also, how expeditiously each deportation proceeding can be concluded, and therefore how long the bail in each case need be in effect, are relevant considerations.

But it is argued that, since an introductory section of the Internal Security Act makes a "legislative finding" of the threat represented by the Party,[7] Congress intended membership in the Communist Party alone to serve as a reasonable basis for believing individual aliens too dangerous to leave at large. Such an interpretation renders meaningless the discretion granted the Attorney General wherever the deportation charge is membership in the Communist Party. The argument means that he may exercise discretion as to bail only to deny bail. Congress did not write such a Hobson's choice into law. True, the bail provisions apply to deportation proceedings brought on other grounds. However, the absorbing concern of Congress in the Internal Security Act was with the problem of the Communist Party; that Act for the first time explicitly made membership in the Communist Party a ground for deportation.[8] It puts Congress in a stultifying position to suggest that it gave with one hand only to take away with the other.

In these cases the Attorney General has not exercised his discretion by applying the standards required of him. He evidently thought himself under compulsion of law and made an abstract, class determination, not an individualized judgment. When the five aliens were arrested originally (one as late as June, 1950), all were released on bail, ranging from $5,000 for one to $1,000 for another; three were released on $2,000 bail. Much is made of the fact that the enactment of the Internal Security Act on

---

[7] Internal Security Act of 1950, § 2, 64 Stat. 987.

[8] Internal Security Act of 1950, § 22, 64 Stat. 987, 1006, 8 U. S. C. (Supp. IV) §§ 137, 137–3.

September 22, 1950, intervened between the original grant
of bail and the subsequent rearrest and detention of the
aliens. The only change in that Act relevant to these
deportation proceedings was the provision making mem-
bership in the Communist Party specifically a basis for
deportation.[9] New warrants charging membership in the
Communist Party at some time after entry were served on
the rearrested aliens in Los Angeles, though not on Zydok
in Detroit. The immigration authorities were by the Act
relieved of proving—in order to make a prima facie case—
that the Communist Party is an "organization . . . that
believes in, advises, advocates, or teaches . . . the over-
throw by force or violence of the Government." [10] But in
the circumstances of today a legislative definition of the
Communist Party as an organization advocating violent
overthrow of government made little difference in the
required proof.[11] At any rate, a complete answer is that
nowhere—either in his returns to the writs of habeas
corpus or elsewhere—has the Attorney General made any
assertion that the Internal Security Act eased the proof of
deportability, indicating by his silence that such a factor
did not influence his judgment.[12] The returns in the
Los Angeles cases supported the denial of bail solely by
the statement, "said facts cause the said Acting Commis-

[9] *Ibid.*

[10] 40 Stat. 1012, 8 U. S. C. § 137 (c).

[11] See *Dennis* v. *United States,* 341 U. S. 494, 510–511, and the
concurring opinion of MR. JUSTICE JACKSON in *American Communi-
cations Assn.* v. *Douds,* 339 U. S. 382, 422.

[12] A radiogram to the District Director of Immigration and Natural-
ization in Los Angeles from the Acting Commissioner in Washington
compendiously justified holding the four Los Angeles aliens without
bail thus:

". . . the instruction . . . was issued only after the cases had been
examined in the light of the Internal Security Act . . . and the
spirit and intention thereof and all of the factors concerning the

sioner to believe that if the said petitioner[s] were enlarged on bail [they] would engage in activities which would be prejudicial to the public interest, and would endanger the welfare and safety of the United States." The return in Zydok's case stated no reasons for the Attorney General's decision. The only evidence at the hearings was also directed solely to the Communist activities of the aliens.

The insubstantiality of the evidence for showing any danger in freeing each individual alien on bail raises ample doubt whether the Attorney General exercised a discretion as instructed by statute. In Zydok's case the claim is that he had been a member of the Communist Party and financial secretary of a Hamtramck, Michigan, section in 1949, a year before his rearrest and denial of bail on October 23, 1950. From Zydok's failure to deny present membership during his testimony, the District Court drew the conclusion that he was "knowingly and wilfully participating in the Communist movement." This was clearly a violation of Zydok's privilege against self-incrimination, which he many times claimed.[13] But assuming that the Attorney General had evidence before him that Zydok was at present a member of the Communist Party, that alone is insufficient to show danger in freeing him on bail during the deportation proceeding. To deny bail, the Attorney General should have a reasonable basis for believing that the circumstances attending Zydok present too hazardous a risk in leaving him at large.

---

likelihood of the deportability and the activities of said alien had been given careful consideration as well as the factors of undue hardship which continued detention might impose."

The radiograms, in October, 1950, to the District Director in Detroit ordering Zydok's rearrest and detention without bail gave no reasons for the action.

[13] See 20 Stat. 30, 18 U. S. C. § 3481; *Wilson* v. *United States*, 149 U. S. 60, 66. See also *Blau* v. *United States*, 340 U. S. 159.

There is also no evidence on the activities of the other four aliens that is more recent than 1949—a year before the issuance of the relevant warrants for deportation and the denials of bail here under review—with the exception of a newspaper article by Carlson published in late 1950. In fact, in the case of Carlisle and Stevenson the Government had no evidence of activity or membership in the Communist Party more recent than the 1930's. Since all these aliens when previously arrested were released on bail, we cannot escape the conclusion that the Attorney General after the enactment of the Internal Security Act did not deny bail from an individualized estimate of "the danger to the public safety of [each person's] presence within the community." [14]

---

[14] In a case just decided, the Court of Appeals for the Second Circuit found a not unreasonable exercise of discretion by the Attorney General in circumstances that are here wanting. An extract from the opinion of Judge A. N. Hand illumines the differences: ·

"In his petition for the writ, Young alleged facts indicating that if released he would be available for any further proceedings at which his presence would be required. The return to the writ, however, contained allegations which, if accepted, established a reasonable foundation for the denial of bail by the Attorney General. Thus the return, in addition to containing allegations of membership in the Communist party, alleged that Young had once before escaped from custody during earlier proceedings; that he had previously attempted to enter the United States by furnishing a false identity and with a fraudulent passport; and that during his present detention he refused to answer questions relating to prior identification, places of residence, employment and home life. Section 2248 of the Judicial Code, 28 U. S. C. § 2248, requires that the facts alleged in the return be taken as true unless impeached, and Young in his traverse to the return did not refute those statements, nor did he in his motion for reargument, make any offer to prove the contrary, nor did he assert new facts, which under 28 U. S. C. § 2246 could have been accomplished by affidavit. As the Supreme Court has recently said in Stack v. Boyle, 342 U. S. 1, 4: 'The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty.'" United States ex rel. Young v. Shaughnessy, 194 F. 2d 474 (C. A. 2d Cir., February 13, 1952).

568

We are confirmed in this conclusion by the Attorney General's practice. For we are advised by the Solicitor General that it has been the Government's policy since the Internal Security Act to terminate bail for all aliens awaiting deportation proceedings whom it deems to be present active Communists, barring only those for whom special circumstances of physical condition or family situation compel an exception. The ordinary considerations of availability to respond to the final judgment of the courts have apparently been ruled out by the Attorney General since the enactment of the Internal Security Act. All those whom the Government believes to be active Communists are considered unbailable without individualized consideration of risk from their continued freedom. It must therefore be inferred that the Attorney General acted on the assumption that, because he was convinced that the aliens here were present Communist Party members, they were not bailable. These persons should have the benefit of an exercise of discretion by the Attorney General, freed from any conception that Congress had made them in effect unbailable. We think that the California case should be returned to the District Court for discharge of the four persons detained unless the Attorney General within a reasonable time makes a new determination on the bail question using the standards here outlined. And if Zydok is rearrested under a new warrant, the Attorney General will have a fresh opportunity to exercise his discretion in setting bail.

MR. JUSTICE DOUGLAS, dissenting.

My reasons for dissent strike deeper than the bail provisions of the Eighth Amendment. According to the warrants of arrest issued on October 31, 1950, the petitioners in No. 35 are being detained for deportation because they were formerly members of the Communist Party of the United States. Zydok, the respondent in

No. 136, was arrested for present Communist Party membership, but no charge has been made that he has been guilty of any seditious conduct or that he has committed any overt act endangering our national security. If the Constitution does not permit expulsion of these aliens for their past actions or present expressions unaccompanied by conduct—and I do not think it does*—then they are illegally detained and should be set free, making the issue of bail meaningless.

Mr. Justice Burton, dissenting.

I join the dissenting opinion of Mr. Justice Frankfurter and add the suggestion that the Eighth Amendment lends support to the statutory interpretation he advocates. That Amendment clearly prohibits federal bail that is excessive in amount when seen in the light of all traditionally relevant circumstances. Likewise, it must prohibit unreasonable denial of bail. The Amendment cannot well mean that, on the one hand, it prohibits the requirement of bail so excessive in amount as to be unattainable, yet, on the other hand, under like circumstances, it does not prohibit the denial of bail, which comes to the same thing. The same circumstances are relevant to both procedures. It is difficult to believe that Congress now has attempted to give the Attorney General authority to disregard those considerations in the denial of bail.

---

*See my dissents in Dennis v. United States, 341 U. S. 494, 584–589; Harisiades v. Shaughnessy, 342 U. S. 580, 598.