# Department of Justice Authority to Provide "Protective Custody" for Defectors

While any component of the Department of Justice may contract with the Department of state to perform the latter's security functions, the Department of State is not authorized to provide protective custody to defectors who are neither leading figures in, nor direct representatives of, their government.

The Attorney General has authority under the Immigration and Nationality Act to prevent departure of an alien defector who is being repatriated under duress and might, in a particular case, have discretionary authority to provide some sort of protective custody for that defector.

Under § 235(b) of the Immigration and Nationality Act, the Immigration and Naturalization Service has authority to detain a defector who is deportable or excludable, until such time as he is granted political asylum.

If a defector is assaulted, harassed, specifically threatened, or abducted, so as to bring into play one of several potentially applicable federal criminal statutes, federal law enforcement agencies may be authorized to play a role in his protection.

The Secretary of State may designate any defector an official guest in order to make it a federal offense to assault, harass, intimidate, coerce, imprison, threaten, kidnap, or kill the defector.

January 17, 1980

## MEMORANDUM OPINION FOR THE
## ACTING ASSOCIATE ATTORNEY GENERAL

This responds to your inquiry regarding the authority of Department of Justice agencies to protect aliens who have defected to the United States. You ask us to assume:

(1) That the defector is not an obvious source of intelligence information;

(2) That the defector is within the United States and at or near an office of the Federal Bureau of Investigations (FBI) or the Immigration and Naturalization Service (INS);

(3) That the defector is seeking political asylum in the United States;

(4) That neither the Department of State nor any other government agency has "firm information" that the defector is threatened with either forced repatriation or bodily harm; and

(5)  That "the circumstances of the defection are such that a reasonable person might wish to take security precautions."

You ask whether, in such a case, any component of the Department of Justice would have authority to fulfill a request made by the Department of State to provide "protective custody" for the defector.

You do not define "protective custody." We shall assume that it does not involve taking any action against the defector's will, and that the defector consents to any arrangement made for his protection. We shall also assume that it involves at least protecting the defector against the possibility of physical attack. For the reasons stated below, we believe that no component of the Department of Justice has authority even to protect defectors against the possibility of physical attack in *all* cases of the sort you describe, although certain agencies may have authority to provide protection against the danger of physical attack, and perhaps a form of protective custody as well, in some cases.

## 1. U.S. Marshals Service Acting Under Agreement With the Department of State

Under 31 U.S.C. § 686(a), "[a]ny executive department . . . or any bureau or office thereof . . . may place orders with any other such department, establishment, bureau, or office, for . . . work, or services, of any kind that such requisitioned Federal agency may be in a position to supply or equipped to render . . . ." This provision would authorize any component of the Department of Justice to contract with the Department of State to perform the latter's security functions. Since the Marshals Service administers the federal witness protection program, 18 U.S.C. prec. § 3481, 28 C.F.R. § 0.111(c), it is the agency most clearly "in a position to" protect defectors. Thus, if the Department of State can itself provide protective custody for defectors, the Marshals Service can also do so under an agreement with it.[1]

In most cases of the sort you describe, however, the Department of State lacks the authority even to protect defectors against the possibility of a physical attack. Under 22 U.S.C. § 2666, qualified Department of State security officers "are authorized to carry firearms for the purpose of protecting heads of foreign states, official representatives of foreign governments, and other distinguished visitors to the United States . . . and members of the immediate families of any such

---

[1] The Marshals Service currently has an agreement with the Department of State to "provide manpower and equipment as determined by the Marshals Service, in order to augment the State Department's capacity to carry out its protective functions in the most secure manner," "subject to manpower availability and normal mission requirements." This agreement provides that the Department of State is to reimburse the Marshals Service for its work. Whether the requisitioning agency must reimburse the agency providing the service depends on the terms of the agencies' respective authorization and appropriations statutes. *See* 13 Comp. Gen. 234 (1934); 34 Comp. Gen. 42 (1954).

349

persons,"[2] No other statute gives the Department of State explicit authority to protect anyone. It might be suggested that visiting athletes and artists, for example, are "distinguished foreign visitors" and perhaps "official representatives" of their governments; if they defect, § 2666 might authorize their protection. Two arguments militate against this interpretation, however.

First, the original version of § 2666, in effect until 1975, authorized security officers of the Department of State to protect "heads of foreign states, high officials of foreign governments and other distinguished visitors to the United States . . . and official representatives of foreign governments and of the United States attending international conferences, or performing special missions." Pub. L. No. 84-104, 69 Stat. 188 (1955). There is no indication in the legislative history that the 1975 rewording was intended to alter the scope of the statute. *See* S. Rep. No. 337, 94th Cong., 1st Sess. 22 (1975). Because the term "distinguished visitors" was linked with "high officials of foreign governments" in the original version of § 2666 and even more clearly in its legislative history, *see, e.g.,* H.R. Rep. No. 468, 84th Cong., 1st Sess. 1 (1955), "distinguished visitors" must, we believe, be limited to leading political, diplomatic, and military figures. We doubt it can be extended to include all prominent foreign visitors who might happen to defect while in the United States. The original version of § 2666 also suggests that the "official representatives" protected are those "attending international conferences, or performing special missions." Again, Congress seemed to have in mind official conferences concerned with political, military, or diplomatic matters; one of the justifications for the bill was the need "to guarantee the safety from compromise of the vast amount of highly classified material needed at an international conference." S. Rep. No. 552, 84th Cong., 1st Sess. 2 (1955). Congress may have intended to expand this category somewhat by omitting the reference to international conferences and special missions, but there is no reason to believe that "official representatives" includes persons other than those acting directly on behalf of their respective governments.

The second argument reinforces this conclusion. In 1972 Congress amended several statutes to make it a federal crime to assault, threaten, harass, kidnap, or kill "official guests." Pub. L. No. 92-539, §§ 101-301, 86 Stat. 1070 (1972), *amending* 18 U.S.C. §§ 112, 1116, 1201. Congress created this category of "official guests" because it wanted federal criminal laws to "operate to protect the rights of visiting artists, academic and scientific groups, and other groups and individuals who ought not be beyond the pale of Federal concern." S. Rep. No. 1105, 92d Cong., 2d Sess. 9 (1972). Congress thought that such visitors would

---

[2] Under 22 U.S.C. § 2666, Department of State security officers are also authorized to protect "the Secretary of State, the Deputy Secretary of State, official representatives of the United States Government, and members of the immediate families of any such persons."

350

otherwise receive no federal protection against such offenses, *see, e.g., id.* at 7; yet at the time, the predecessor of § 2666 had been in effect for 17 years. When Congress amended § 2666 in 1975, it did not include "official guests" in the new version of the statute; it retained the term "official representatives." This again suggests that Congress did not wish to authorize Department of State security officers to protect even such prominent foreign visitors as athletes, artists, and academics.[3]

For these reasons, we seriously doubt that the Department of State has authority to request the Marshals Service to protect defectors who are neither leading figures in, nor direct representatives of, their governments. Moreover, it is unlikely that an "official representative" would retain his status if the country he purported to represent attempted to strip him of it. The Marshals Service would, of course, be able to protect "distinguished foreign visitors" who defect[4]—presumably a small proportion of the cases we are considering here.

## 2. FBI Authority

Under 28 U.S.C. § 553 (1), (3), the FBI is empowered "to detect and prosecute crimes against the United States" and "to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General." Whatever authority these provisions may give to protect potential victims of federal crimes against whom a specific threat has been made, we believe that they do not authorize the FBI to protect defectors in the circumstances we are considering here. *Compare* 28 U.S.C. § 553 *with* 18 U.S.C. § 3481 note (specifically authorizing the Attorney General to "provide for the security of" government witnesses who testify against alleged participants in organized crime.)[5]

---

[3] 22 U.S.C. § 2667 empowers Department of State security officers "engaged in the performance of the duties prescribed in section 2666" to "arrest without warrant and deliver into custody any person violating section . . . 112 of title 18 in their presence or if they have reasonable grounds to believe that the person to be arrested has committed or is committing such a violation." *See also* 22 C.F.R. § 2.1. Under 18 U.S.C. § 112, it is a crime to assault, harass, intimidate, coerce, threaten, or similarly harm foreign officials, internationally protected persons, or official guests. For reasons we give in section 5, *infra*, we believe that § 2667 may enable Department of State security officers to provide some aid to defectors who have been specifically threatened or harmed. But for two reasons, § 2667 cannot be read to authorize Department of State security officers to protect "official guests," or others within the scope of § 112, if they have not been specifically threatened. First, security officers whose mission was to provide such protection would be "engaged in the performance of . . . duties" *not* enumerated in § 2666. Second, we doubt that the authority to enforce a statute by arresting violators implies the authority to protect persons when no specific threat has been made, especially when another statute expressly authorizes the protection of a smaller class of persons.

[4] Indeed, the Marshals Service may already have this power under the existing agreement, *see* note 1 *supra*.

[5] The Director of Central Intelligence, the Attorney General, and the Commissioner of Immigration and Naturalization can authorize certain aliens to enter the United States, notwithstanding other immigration laws, if their entry "is in the interest of national security or essential to the furtherance of the national intelligence mission." 50 U.S.C. § 403h. Pursuant to this authority, the National Security Council and the Director of Central Intelligence have established a program for dealing with defectors who are valuable to intelligence agencies. The FBI plays a role in this program, but the program plainly omits authority for the FBI or any other agency to house or otherwise maintain defectors of the sort you describe. This, too, suggests the FBI has no role in providing protective custody in the circumstances we are considering here.

### 3. The Attorney General's Authority To Enforce § 215 of the Immigration and Nationality Act

Under 8 U.S.C. § 1103(a), the Attorney General is "charged with the administration and enforcement of [the Immigration and Nationality Act] and all other laws relating to the immigration and naturalization of aliens." Ordinarily, he carries out this responsibility through the Immigration and Naturalization Service. Section 215(a)(1) of the Act provides:

> Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1). It appears to us that current regulations would not, in general, authorize the Attorney General to prevent the departure of a defector in the circumstances you describe.[6] But we believe that § 215(a)(1) would authorize regulations prohibiting the departure of, for example, an alien defector who was being repatriated either under duress or in circumstances that cast doubt on the ability of the United States to protect defectors.[7] If a regulation were issued that

---

[6] The regulations, 22 C.F.R. § 46.2, provide that "[n]o alien shall depart, or attempt to depart, from the United States if his departure would be prejudicial to the interests of the United States under the provisions of [22 C.F.R.] § 46.3." Section 46.3 then specifies the categories of aliens whose departure "shall be deemed prejudicial to the interest of the United States." None of these categories will apply to all defectors of the kind you describe, and few of the categories are likely to apply to any. Section 46.3(g), for example, prohibits the departure of "[a]ny alien who is needed in the United States as a witness in . . . any criminal case under investigation or pending in a court in the United States." An investigation of a possible violation of some state or federal criminal statute, *see* section 5 *infra*, might be warranted in some cases of the kind you describe and the defector might be needed as a witness at that investigation. But if, as you specified, there is no "firm information" that the defector is likely to be abducted or physically harmed, a criminal investigation will generally not be warranted. Section 46.3(h) prohibits the departure of "[a]ny alien who is needed in the United States in connection with any investigation or proceeding being, or soon to be, conducted by any official executive, legislative, or judicial agency in the United States or by any governmental committee, board, bureau, commission, or body in the United States, whether national, state, or local." 22 C.F.R. § 46.3(h). This provision might appear to allow a defector to be kept in the United States, if, for example, a government body planned to ask him formally about his reception by American officials or about relatives or assets remaining in the nation from which from he defected and possible diplomatic action concerning them. But we doubt that this provision would be construed to reach cases in which the formal inquiry is a pretext and the true "prejudice to the interests of the United States" stems not from the alien's failure to appear at the inquiry but from the manner or circumstances in which he departed. Invoking 22 C.F.R. § 46.3(k) would present the same problem. It effectively prohibits the departure of an alien whose case "involves circumstances of a [character] similar" to the other categories under § 46.3. While not all of these categories involve, for example, national security or national defense, *see, e.g.,* 22 C.F.R. § 46.3 (f), (g), (h), they all do involve, at the least, aliens whose personal characteristics— their knowledge, intentions, or legal liabilities—make their departure prejudicial to the United States. None involves an alien who does not wish to depart; none involves an alien whose personal characteristics are unimportant but who would depart in a manner or under circumstances which reflect unfavorably on the United States. For these reasons, we believe that new regulations should be issued if the Attorney General is to exercise his power under § 215(a)(1) to prevent the departure of defectors in the circumstances you mention.

[7] By its terms, § 215(a) grants the President full power to regulate the departure of aliens, requiring only that the regulations be reasonable. The legislative history of § 215(a) shows that Congress

Continued

352

effectively prohibited the departure of a defector in the circumstances you describe, we believe the § 215(a)(1) might, in a particular case, authorize the Attorney General to provide some form of protective custody for that defector.

Nothing in § 215(a)(1) suggests that the Attorney General must mechanically refrain from acting until a defector whose departure he is authorized to prevent is boarding an airplane. Implicit in the Attorney General's duty to enforce the Immigration and Nationality Act is the authority to use all reasonable and necessary means to see that it is enforced. *See, e.g., United States* v. *Krapf,* 285 F.2d 647, 650 (3rd Cir. 1961); *United States* v. *Jones,* 204 F.2d 745, 754 (7th Cir. 1953); *United States* v. *Kelly,* 55 F.2d 67 (2d Cir. 1932). In addition, law enforcement authorities customarily have great discretion to decide how to enforce the law. Thus, the Attorney General may determine in a particular case that in order to prevent a defector from departing he must, for example, keep the defector under surveillance so that he can act quickly to prevent a departure or abduction. For similar reasons, the Attorney General would, we believe, be entitled to screen a defector's contacts with other people or to guard the defector in order to prevent attempts to coerce the defector to leave.[8] These steps would appear to be the kind of protective custody you have in mind. They would, we believe, be authorized if they were part of a good faith effort to enforce § 215(a)(1) in light of its underlying policies.

Indeed, the structure of § 215 suggests that the Attorney General has unusually broad discretion to decide which measures are necessary to prevent violations of that section. Section 215(a)(1) declares that it is "unlawful" for certain aliens to leave the United States but prescribes no penalties for violations. Those penalties, which applied both to aliens who illegally entered or departed the United States and to American citizens who attempted to enter or depart without passports, *see* Immigration and Nationality Act, Pub. L. No. 82-414, ch. 477, § 215(a)(1), 66 Stat. 190 (1952) (prior to 1978 amendment), vere repealed by Congress in 1978. Pub. L. No. 95-426, § 707(d), 92 Stat. 993. The legislative history of the repeal suggests that while Congress did not wish to "obstruct" or penalize the travel of American citizens, it intended to leave intact the President's authority to regulate the entry or departure

intended the President to have "broad and comprehensive power," "wide discretion and wide authority of action." H.R. Rep. No. 485, 65th Cong., 2d Sess. 2-3 (1918) (accompanying Act of May 22, 1918, Pub. L. No. 65-154, ch. 81, § 1(a), 40 Stat. 559, which § 215(a) essentially reenacted. *See* H.R. Rep. No. 1365, 82d Cong., 2d Sess. (1952)). There is no reason to believe that Congress did not intend the President to use this power to pursue the important humanitarian and foreign policy aims that would be served by preventing the departure of aliens who do not wish to leave. Indeed, Congress envisioned the President using his authority as a "counterstroke" against the "propaganda" efforts of "hostile nations." H.R. Rep. No. 485, 65th Cong., 2d Sess. 3 (1918).

[8] In this connection we emphasize our assumption that the defector consents to the steps the Attorney General is taking to protect him. It is not at all clear that the Attorney General can legally isolate a defector in this way without his consent. Also, we assume that the Attorney General will comply with any international obligations the United States has to permit contacts with defectors.

of aliens under § 215(a)(1). *See* 124 Cong. Rec. 15770 (May 31, 1978) (remarks of Rep. Eilberg). Moreover, nothing in the language of § 215(a)(1) suggests that it is intended to be merely admonitory. *Compare* 8 U.S.C. § 1185(a) *with* 36 U.S.C. § 175 (flag code); *see Holmes* v. *Wallace,* 407 F. Supp. 493, 494–97 (M.D. Ala. 1976). The primary purpose of § 215(a)(1), then, must be to authorize *preventive* action, either administrative or judicial, against aliens who are about to depart illegally. Several other sections of the Immigration and Nationality Act give great discretion to the administrators charged with their enforcement, thus suggesting that Congress envisioned administrative not judicial action to enforce § 215(a)(1); in addition, as we have said, the Attorney General is specifically charged with enforcing the Act, 8 U.S.C. § 1103(a). Since prevention is the only means of enforcing § 215(a)(1), and the Attorney General is primarily responsible for enforcing it, one may reasonably infer that the Attorney General can act more vigorously to prevent violations of § 215(a)(1) than he might act in preventing violations of statutes with more diverse enforcement mechanisms. This further supports the conclusion that in some cases § 215(a)(1), by implication, authorizes the Attorney General to provide defectors whose departure he can prevent with a form of protective custody.

Since Congress has not explicitly authorized such protective custody of defectors, however, *compare* 8 U.S.C. § 1185(a)(1) *with* 18 U.S.C. prec. § 3481, we would advise that the Department take steps to inform the appropriations committees of the Senate and House that we regard § 215(a)(1) as authority to do so in isolated instances and on a temporary basis in connection with the enforcement of § 215(a)(1).

### 4. Delaying the Grant of Political Asylum

Until an alien is granted political asylum, the Immigration and Naturalization Service has authority to detain him if he fits either of two categories. We believe it is reasonable to assume that a defector who is detained can be adequately protected. Under § 235(b) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b):

> Every alien [with exceptions not relevant here] who may not appear . . . at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer.

*See generally* 8 C.F.R. § 235.3(b). If an alien has legally entered the country, § 235(b) cannot authorize his detention. But while attempting to defect, an alien may render himself technically deportable—perhaps by violating a condition of his visa—or may be about to render himself

354

deportable. Section 242(a), 8 U.S.C. § 1252(a), would then apply:

> Pending a determination of deportability in the case of any alien . . . such alien may, upon warrant of the Attorney General, be arrested and taken into custody. Any such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (1) be continued in custody, or (2) be released under bond . . . or (3) be released on conditional parole. But such bond or parole . . . may be revoked at any time by the Attorney General, in his discretion, and the alien may be returned to custody under the warrant which initiated the proceedings against him and detained until final determination of his deportability.[9]

The Supreme Court has rejected the view that § 242(a) authorizes the Attorney General to detain an alien only if the alien's detention is necessary to secure his appearance at a deportation hearing. *See Carlson v. Landon,* 342 U.S. 524, 534, 541 n.35 (1952). The Court has suggested that an alien may be detained pending deportation proceedings whenever the Attorney General has a "reasonable apprehension" that releasing the alien will injure the national interest, *see id.* at 538, 542, and has not required that the "reasonable apprehension" be supported with specific threats or facts; broad generalizations suffice. *See id.* at 541, 544. Moreover, as the Court has acknowledged, the legislative history of § 242(a) makes plain Congress' intention to vest the Attorney General with considerable discretion in deciding which aliens to detain. *See id.* at 540–41.[10] Since the Attorney General can reasonably conclude that the national interest would be injured if a defector were severely harassed or forcibly repatriated, we believe that in the cases we are considering here § 242(a) would authorize the detention of a deportable defector who consented[11] to be detained.

Since most aliens who have been granted political asylum will not be deportable or excludable, it appears that the Immigration and Naturalization Service has authority to detain a defector only until he is granted asylum. A defector who is entering the country is likely to submit his application for asylum to an immigration judge, "who shall consider that application in connection with an exclusion hearing. . . ." 44 Fed. Reg. 21253, 21258 (1979). A defector who is already in the United States will probably submit his application to the district director. *Id.* In that case, regulations provide that:

> The applicant shall appear in person before an immigration officer prior to adjudication of the application. . . .

---

[9] Current regulations require that deportation proceedings be formally initiated before an alien is detained under § 242(a). 8 C.F.R. § 242.2(a).

[10] The General Counsel's office of the Immigration and Naturalization Service informs us that administrative interpretations of § 242(a) essentially follow the Supreme Court's.

[11] *See* note 12 *infra.*

The district director shall request the views of the De-
partment of State before making his decision unless in his
opinion the application is clearly meritorious or clearly
lacking in substance. The district director may approve or
deny the application in the exercise of discretion.

8 C.F.R. § 108.2. An exclusion hearing is potentially an elaborate affair,
*see* 8 C.F.R. § 236.2, and creates opportunity for delay. The district
director, and the Department of State where it plays a role, might in
the normal course also contribute to delay. Nothing in the Immigration
and Nationality Act prohibits an immigration judge or district director,
in managing his docket, from giving priority to other cases over one
which both parties are willing to delay. If the defector consents,[12]
then, and if he is otherwise lawfully in custody, the Immigration and
Naturalization Service might delay action on his application for asylum
and keep him in custody until any danger to him subsides and until, in
due course, his request for asylum is granted. This approach appears to
authorize protective custody for some of the defectors your memoran-
dum describes.

### 5. The Federal Law Enforcement Role if a
### Defector Is Assaulted or Threatened

The Department of Justice has authority to protect defectors of the
kind you describe only in the circumstances we have discussed. You
should be aware, however, that once a defector is assaulted, harassed,
specifically threatened, or abducted, federal law enforcement agencies
may be authorized to play a role. Specifically, we believe, for reasons
stated below, that the Secretary of State may designate a defector an
"official guest" and in that way give federal law enforcement agencies
clear jurisdiction over any assaults, harassment, threats, and similar
offenses against the defector, without regard to the interstate character
of the offense or to any of the other usual bases for federal law
enforcement jurisdiction. This conclusion may be important to you in
dealing with defections in the future.

As we noted earlier, several federal statutes make it a crime to injure

---

[12] If a defector does not consent, he will be able to invoke portion of § 242(a) itself to gain relief:
Any court of competent jurisdiction shall have authority to review or revise any
determination of the Attorney General concerning detention, release on bond, or
parole pending final decision of deportability upon a conclusive showing in habeas
corpus proceedings that the Attorney General is not proceeding with such reasonable
dispatch as may be warranted by the particular facts and circumstances in the case of
any alien to determine deportability.
8 U.S.C. § 1252(a). He may also be able to raise serious constitutional questions about his continued
detention. *See Stack* v. *Boyle,* 342 U.S. 1 (1952); *compare Carlson* v. *Landon,* 342 U.S. 524 (1951), *with
Barenblatt* v. *United States,* 360 U.S. 109, 128 (1959).

"official guests" of the United States in these ways. For example, 18 U.S.C. § 112 provides:

> (a) Whoever assaults, strikes, wounds, imprisons, or offers violence to a foreign official, official guest, or internationally protected person or makes any other violent attack upon the person or liberty of such person, or . . . makes a violent attack upon his official premises, private accommodation, or means of transport or attempts to commit any of the foregoing shall be fined not more than $5,000 or imprisoned not more than three years, or both.
>
> (b) Whoever willfully—
>> (1) intimidates, coerces, threatens, or harasses a foreign official or an official guest or . . .
>> (2) attempts to intimidate, coerce, threaten, or harass a foreign official or an official guest . . .
>
>         *       *       *       *       *
>
> shall be fined not more than $500 or imprisoned not more than six months, or both.

Other statutes make it a federal offense unlawfully to kill or attempt to kill an official guest, *id.* § 1116(a), to kidnap an official guest, *id.* § 1201(a)(4), or to threaten to assault, kidnap, or kill an official guest, whether or not in connection with an extortionate demand, *id.* § 878 (a), (b). For purposes of applying these statutes, an official guest is defined as "a citizen or national of a foreign country present in the United States as an official guest of the Government of the United States pursuant to designation as such by the Secretary of State." 18 U.S.C. § 1116(b)(6).[13] We believe that the Secretary of State can designate a defector as an official guest solely in order to bring him within the coverage of these criminal statutes, thus enabling federal law enforcement agencies[14] to act against anyone who assaults, threatens, harasses, coerces, kidnaps, or otherwise similarly injures a defector.

As we have noted, Congress created the category of official guests because it wanted federal criminal law to "operate to protect the rights of visiting artists, academic and scientific groups," and similar groups and individuals. S. Rep. No. 1105, 92d Cong., 2d Sess. 9 (1972). Certain aspects of the legislative history suggest that Congress did not intend to permit foreign visitors to be classified as official guests simply because they were threatened. For example, in suggesting to Congress the

---

[13] The Secretary of State has delegated his authority to designate official guests to the Deputy Under Secretary of State for Management. 22 C.F.R. § 2.4.

[14] As we have said the FBI has general authority "to detect and prosecute crimes against the United States" and to conduct certain other investigations. 28 U.S.C. § 553 (1), (3). Department of State security officers are specifically authorized, "while engaged in the performance of the duties prescribed" by statute, *see* pp. 2-4 *supra,* "to arrest without warrant and deliver into custody any person violating section . . . 112 of title 18 in their presence or if they have reasonable grounds to believe that the person to be arrested has committed or is committing such a violation." Other law enforcement agencies have some authority to arrest persons they reasonably believe to have committed felonies. *See, e.g.,* 18 U.S.C. § 3056(a) (Secret Service).

357

language that became the definition of "official guest," the then Secretary of State said, "This will allow me to designate individuals or groups of individuals who are here for important international sports or other events. . . . This would accord protection to foreign nationals who visit the United States for such special reasons as to compete in international sports events." *Id.* at 15–16. In general, Congress focused on threats to visitors which were, at least in part, the result of the visitors' special role in activities of interest to both their country and ours. Congress was also concerned with the implicit obligation we have to their respective countries to protect such visitors. If these were the bases of Congress' decision to make it a crime to assault or threaten "official guests," that category cannot be extended to reach ordinary visitors who are threatened only because they have defected.[15]

The legislative history, however, contains no clear references to reciprocity, or to the fear that Americans will be inadequately protected abroad; this suggests that Congress may have been concerned less with international obligations than with our international reputation. That reputation would be injured if a defector were attacked or threatened by the nation from which he defected. Moreover, while the legislative history does not refer to the danger that defectors might be forcibly repatriated, Congress clearly had in mind politically motivated threats and acts against foreign visitors; the killing of Israeli athletes at Munich in 1972 was repeatedly cited as an example of the sort of crime which would have to be left entirely to the states if federal criminal laws were not extended to official guests. *See, e.g., id.* at 9, 15. And nothing in the statutes or their legislative history makes an exception for politically motivated violence or coercion by the nation of which the guest is a citizen.

Finally, Congress carefully considered the issues of federalism involved in creating a category of "official guests" and allowing the federal government, in addition to the states, to punish certain crimes against them. For example, the sponsor of the provision including "official guests" in the several federal criminal statutes gave, as his principal reason, "State governments simply cannot cope alone with crimes involving international politics and diplomacy." *Id.* at 9. In language we have already quoted, the Senate Committee noted that the protection would extend generally to "groups and individuals who

---

[15] We do not believe that the Secretary of State must designate a visitor an official guest before he enters the country. The statutory definition arguably requires that an official guest be "present in the United States . . . pursuant to designation," suggesting that a person who is present in the United States on his own initiative cannot qualify as an official guest. This language is not, however, unequivocal; it does not specify that an official guest must have entered the country pursuant to a designation. The phrase "pursuant to designation as such by the Secretary of State" may, we believe, be read simply to modify "official guest," describing how one attains that status. Moreover, the legislative history indicates that the category of "official guest" was created precisely in order to provide a federal role in enforcing laws making it illegal to assault, harass, or kidnap foreign nationals visiting the United States. There seems to be little reason to insist that the Secretary must foresee, before the visitors enter the country, that they will be threatened.

358

ought not be beyond the pale of Federal concern." *Id.* This emphasis on federalism suggests that the defining characteristic of official guests is their importance to foreign policy and related concerns of the federal government; the treatment of defectors is at least as important to foreign policy as the treatment of visiting artists and athletes. In addition, if there is a possibility that a defector will be harassed or coerced by the nation from which he has defected, the federal government is likely to be involved in negotiations and diplomatic maneuvers which must be coordinated with law enforcement efforts undertaken on the defector's behalf. For these reasons, we believe that the Secretary of State can designate any defector an official guest in order to make it a federal offense to assault, harass, intimidate, coerce, imprison, threaten, kidnap, or kill the defector.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
